**Filed**
**D.C. Superior Court**
**11/16/2016 15:39PM**
**Clerk of the Court**

## IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

Civil Division

| | |
|---|---|
| JENNIFER AKMAN,<br>3001 Veazey Terrace, Apt #409<br>Washington, DC 20008<br><br>      Plaintiff,<br><br>*v.*<br><br>BAYER HEALTHCARE PHARMACEUTICALS,<br>INC.,<br><br>   ***SERVE:***   100 Bayer Boulevard, in<br>                  Whippany, NJ 07981<br><br>BAYER CORPORATION,<br><br>   ***SERVE:***   100 Bayer Road<br>                  Pittsburgh, PA 15205<br><br>COBALT LABORATORIES, INC.<br>AKA COBALT LABORATORIES LLC<br>24840 S Tamiami Trl<br>Ste 1<br>Bonita Springs, FL 34134-7009<br><br><br>ACTAVIS PHARMA COMPANY<br>6733 Mississauga Road<br>Suite 400<br>Mississauga, ON L5N 6J5<br>Canada<br><br>      Defendants. | Case No.  **2016 CA 008298 B** |

## COMPLAINT

**COMES NOW,** Plaintiff, by and through the undersigned counsel, and files this complaint,

and for this cause of action states:

## JURISDICTION

1.    Jurisdiction of this court is invoked pursuant to D.C. Code § 11-921, and by virtue of the fact that all acts and omissions complained of occurred within the District of Columbia.

2.    Venue in this court is proper since the cause of action arose in the District of Columbia.

3.    Plaintiff has complied with all requirements of D.C. Code §16-2802.

## PARTIES

4.    Plaintiff Jennifer Akman is an adult resident of the District of Columbia.

5.    Defendant Bayer HealthCare Pharmaceuticals, Inc. ("Bayer Healthcare") is a Delaware corporation that has its principal place of business at 100 Bayer Boulevard, in Whippany, New Jersey 07981.

6.    In January 2008, Bayer Pharmaceuticals Corporation was merged into Bayer Healthcare.

7.    Bayer Healthcare is involved in the labeling, supplying, selling, and distribution of pharmaceutical products, including Cipro and Avelox, in the United States.

8.    Defendant Bayer Corporation ("Bayer Corp.") is an Indiana corporation that has its principal place of business at 100 Bayer Road, Pittsburgh, Pennsylvania 15205.

9.    Bayer Corp. (formerly known as Miles, Inc.) is an American subsidiary of a German parent, Bayer AG.

10.    Bayer Corp. was engaged in the business of testing, manufacturing, distributing, marketing, advertising, labeling, and selling Cipro and Avelox in the United States.

11.    Bayer AG ("Bayer AG") is a German company that is headquartered in Leverkusen, North Rhine-Westphalia, Germany.

2

12.     Bayer AG is one of the largest pharmaceutical companies in the world and is the researcher, producer, and manufacturer of Cipro and Avelox.

13.     Cobalt Laboratories, Inc., aka Cobalt Laboratories LLC (hereinafter "Cobalt") is a developer, manufacturer, and supplier of generic pharmaceutical products headquartered in Bonita Springs, Florida.

14.     Defendant Actavis Pharma Company ("Actavis") is a Canadian company with its principal place of business in Mississauga, Ontario.

## BACKGROUND

15.     On or about November 2013, Plaintiff Jennifer Akman began taking Cipro.

16.     Ms. Akman ceased taking the medication within a 24-hour window due to experiencing a severe reaction to the medication.

17.     Within a few days of this prescription, Ms. Akman went for a brief jog and when she came back from her run she could barely walk or stand.

18.     Ms. Akman suffered from and continues to suffer from nerve damage as well as injuries in other systems, amounting to what the FDA has deemed Fluoroquinolone Associated Disability, or FQAD.

## FACTUAL ALLEGATIONS

19.     At all relevant times, Defendants were in the business of and did design, research, manufacture, test, advertise, promote, market, sell, distribute, and/or have acquired and are responsible for Defendants who have designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed the FLQ drugs Cipro, Avelox as well as generic ciprofloxacin.

20.     Plaintiff was prescribed and/or otherwise lawfully obtained ciprofloxacin. Thereafter, Plaintiff suffered irreversible peripheral neuropathy, or symptoms of irreversible

3

peripheral neuropathy, and/or a worsening of those symptoms, including pain, burning, tingling, numbness, weakness, alterations of sensation, and/or experienced symptoms of irreversible peripheral neuropathy in addition to injuries from the following body systems: musculoskeletal, neuropsychiatric, sensory (e.g., vision or hearing), skin, and cardiovascular.

21.     FLQs are broad-spectrum synthetic antibacterial agents marketed and sold in oral tablet, IV solution, and ophthalmic solution, used to treat lung, sinus, skin, and urinary tract infections caused by certain germs called bacteria. They are members of the quinolone class of antibiotics.

22.     Quinolones are divided into four generations based on their spectrum of antimicrobial activity. The 1st generation, non-fluorinated quinolone antibiotics were developed in the early 1960s and soon revealed themselves as effective against common gram-negative bacteria, but resistance developed rapidly.

23.     Twenty years later, in the early 1980s, fluorinated derivatives of the quinolones emerged, revealing a broader, more potent antibiotic, effective against common gram-negative and gram-positive bacteria.     These so-called 2nd generation quinolones included Noroxin® (norfloxacin), Cipro (ciprofloxacin), Floxin® (ofloxacin), and pefloxacin (never approved for marketing in the United States).

24.     Cipro was approved by the United States Food and Drug Administration ("FDA") in October 1987 for use in the United States, and is the brand name for the antibiotic ciprofloxacin. Since its introduction to the market in the United States in 1987, the Bayer Defendants have derived over $1 billion in U.S. net sales of all Cipro products. Cipro went off patent on December 9, 2003.

25.     Fluoroquinolones have long been associated with serious side effects. Indeed, many fluoroquinolones have been removed from the United States market due to unacceptable risks of certain adverse events. For example, Omniflox® (temafloxacin) was removed from the market in

4

June 1992 only six months after approval due to low blood sugar, kidney failure, and a rare form of anemia; Trovan® (trovafloxacin) was removed from the market in June 1999 due to severe liver toxicity; Raxar® (grepafloxacin) was removed from the market in October 1999 due to QT-interval prolongation; Zagam® (sparfloxacin) was removed from the market in July 2001 due to QT-interval prolongation; and most recently, Tequin® (gatifloxacin) was removed from the market in May 2006 amid reports of severe blood sugar reactions such as hyperglycemia and hypoglycemia.

26.     Avelox was approved by the FDA on December 10, 1999 for use in the United States, and is the brand name for the antibiotic moxifloxacin.

27.     With the patent for Cipro (another blockbuster fluoroquinolone) set to expire in December 2003, the Bayer Defendants set out to develop and effectively market Avelox in order to be more competitive with 3rd and 4th generation fluoroquinolones, including Levaquin. Avelox quickly became the Bayer Defendants' heir apparent and successor to Cipro.

28.     Similar to Cipro, Avelox has proven to be a blockbuster drug for the Bayer Defendants. In 2007 alone, Avelox generated international sales of $697.3 million dollars.

29.     Defendant Bayer Healthcare has indicated on its website that Avelox is "safe and effective" and "has a well-characterized safety profile, which has been studied in over 14,000 patients in clinical trials and 92,000 patients in post marketing surveillance studies."

30.     However, the scientific evidence has established a clear association between Cipro and Avelox and an increased risk of long-term and sometimes irreversible peripheral neuropathy, as well as other injuries.

31.     Prior to applying to the FDA for and obtaining approval of FLQs, Defendants knew or should have known that consumption of FLQs were associated with and/or would cause chronic and/or permanent peripheral neuropathy.

32.    By 1988, Defendants possessed at least one published case report (funded in part by Bayer),[1] which Defendants knew or should have known constituted a safety "signal" that the use of FLQs was associated with "peripheral paraesthesia" (a form of peripheral nerve damage) and required further investigation and study.

33.    Defendants failed to appropriately and adequately inform and warn Plaintiff and Plaintiff's prescribing physicians of the serious and dangerous risks associated with the use of FLQs concerning irreversible peripheral neuropathy, as well as other severe and personal injuries, which are permanent and/or long-lasting in nature, cause significant physical pain and mental anguish, physical impairment, diminished enjoyment of life, and the need for medical treatment, monitoring and/or medications.

34.    The warning labels and/or other patient prescribing information ciprofloxacin, including that produced by Defendant Cobalt and provided to Plaintiff Akman from September 2004 through August 2013 misled and deceived Plaintiff and her treating physicians by incorrectly advising them that peripheral neuropathy associated with FLQs was "rare" and in any case could be avoided by discontinuing the drug upon the onset of certain symptoms.  The truth, however, is that the onset of irreversible peripheral neuropathy is often rapid and discontinuation of the drug will not ensure that the peripheral neuropathy is reversible. Defendants misled patients and physicians by omitting any mention of the possibility that FLQ use could result in irreversible peripheral neuropathy.

35.    Further, though this injury can be severe and debilitating, the language regarding the "rare" risk of peripheral neuropathy was buried at the bottom of a long list of adverse reactions that

---

[1] *See* Therapy of acute and chronic gram-negative osteomyelitis with ciprofloxacin. Report from a Swedish Study Group (Karlman, K. et al.). *J Antimicrob Chemother* 1988 Aug;22(2):221-8.

were included on the Defendants' FLQ labels; the language was in no way highlighted for the benefit of prescribing physicians and patients.

36.     Additionally, upon information and belief, following the 2004 label change Defendants did not issue any "Dear Doctor" or "Dear Healthcare Professional" letters in the United States that were specific to Cipro or Avelox, and the risk of developing irreversible peripheral neuropathy. Further, Defendants failed to disclose the serious and dangerous side effect of irreversible peripheral neuropathy when promoting Cipro and Avelox to physicians.

37.     Despite the knowledge that FLQ drugs were associated with an elevated risk of prolonged and/or permanent peripheral neuropathy, Defendants' promotional campaign was focused on the purported "safety profile" of FLQs.

38.     FDA regulations require that manufacturers monitor and report adverse events ("AEs") associated with marketed products. 21 C.F.R. § 314.80; 21 C.F.R. § 314.81. The manufacturers are required to review all adverse experience information pertaining to products obtained from any source, foreign or domestic, including from commercial marketing experience, postmarketing clinical investigations, post-marketing epidemiological/surveillance studies, reports in the scientific literature and unpublished scientific papers. Manufacturers review this information for safety "signals."

39.     The FDA has recognized that case reports and case series can play important roles in serving as "safety signals." In fact, the FDA states that a single, well-documented case report can be viewed as a safety signal, particularly if the report describes a positive rechallenge.[2]

40.     Indeed, even a single case report may be sufficient to establish a *causal* relationship between the use of a product and an adverse event.[3]

_____

[2] *See* U.S. Department of Health and Human Services, Food and Drug Administration, Guidance for Industry: Good Pharmacovigilence Practices and Pharmacoepidemiologic Assessment (2005).

41.     In the pharmaceutical industry, including within Defendants' companies, safety signals generally indicate the need for further investigation.[4]

42.     After a signal is identified, the Bayer Defendants are obligated to further assess the signal to determine whether it represents a potential safety risk that should be included in product labeling.

43.     The Bayer Defendants likewise claim that "[w]e maintain accurate product labels that share information about the benefits and risks associated with fluoroquinolone use, and report all adverse events we learn about to the FDA."[5]

44.     Despite these representations, as early as 1988 there was evidence in the medical literature of peripheral nerve damage associated with FLQ therapy (ciprofloxacin), representing a safety "signal" that the Bayer Defendants ignored in violation of the federal regulations.[6] Specifically, in a report from a Swedish Study Group, funded in part by Bayer, Karlman et al. reviewed 40 patients treated with ciprofloxacin for acute or chronic osteomyelitis (38) and acute arthritis (2). The authors identified 9 patients with adverse experiences. Of these 9 adverse experiences, the authors reported one case of "peripheral paraesthesia" which they found was "probably related" to ciprofloxacin treatment.[7]

---

[3] *See* Principles & Practice of Public Health Surveillance, at p. 343. Steven M. Teutsch & R. Elliott Churchill, eds. Third Edition, Oxford University Press, 2010.
[4] *See* Guidance for Industry: Good Pharmacovigilence Practices and Pharmacoepidemiologic Assessment (2005).
[5]     https://www.washingtonpost.com/national/health-science/it-pays-to-read-the-warnings-when-you-open-up-a-prescription/2015/08/03/a29e11b4-d70e-11e4-b3f2-607bd612aeac_story.html.
[6] *See* 21 C.F.R. 201.57(e) (product label must be revised as soon as there was reasonable evidence of an association of a serious hazard with the drug; a causal relationship need not have been proved).
[7] *See* Karlman, K. et al. (Report from a Swedish Study Group). Therapy of acute and chronic gram-negative osteomyelitis with ciprofloxacin. *J Antimicrob Chemother* 1988 Aug;22(2):221-8.

45.     Thereafter, a 1990 study by Chan et al. reviewed 27 patients treated with the fluoroquinolone Peflox for urinary tract infections.[8] One patient developed peripheral neuropathy that resolved 4 weeks after discontinuation, generating an incidence rate of 3.7%. The authors concluded that "[i]ts [i.e. peripheral neuropathy's] relation to the use of pefloxacin was *indisputable*, since it recurred on re-introduction of the drug." (emphasis added). Reviewers at the FDA's Office of Surveillance and Epidemiology (OSE) concluded in an April 17, 2013 pharmacovigilence review that this case represents a positive dechallenge.

46.     Then, in 1992, Aoun et al. published a case report titled "Peripheral neuropathy associated with fluoroquinolones."[9] Specifically, the authors reported an association between the use of pefloxacin, ofloxacin and ciprofloxacin and peripheral neuropathy in a 37 year old patient. The case report was notable for numerous positive dechallenges and rechallenges of the fluoroquinolones in the patient, resulting in reviewers at FDA's OSE to characterize the quality of the evidence reported as a "strong case."

47.     In 1996, Hedenmalm et al. reported the results from a review of 37 patients treated with fluoroquinolones.[10] Of those, 81% experienced paresthesia, 51% experienced numbness, 27% experienced pain, and 11% experienced muscle weakness. The highest incidence of reported symptoms occurred during the first weeks of treatment. The duration of symptoms in the cases where information was provided varied from a few hours to over a year. According to reviewers at FDA's OSE, the quality of evidence from at least 20 of the 37 cases seemed to be "strong with both a good temporal relationship and a positive dechallenge."

---

[8] Chan, PC et al., Clinical experience with pefloxacin in patient with urinary tract infections, *Br. J. Clin. Pract.* 1990.
[9] Auon, M. et al. Peripheral neuropathy associated with fluoroquinolones. Letter to Editor. *Lancet.* 1992.
[10] Hedenmalm, K. et al. Peripheral sensory disturbances related to treatment of fluoroquinolones. *J. Antimicrob. Chemother.* 1996;37:831-7.

48.     One of the first large scale studies in the United States that included the post market experience concerning fluoroquinolones and neuropathy was "Peripheral Neuropathy Associated with Fluoroquinolones" written by Jay S. Cohen. The Cohen paper was published in December 2001 and revealed that adverse events reported by 45 patients suggested a possible association between fluoroquinolones and long-term peripheral nervous system damage. The study noted in particular the presence of severe and/or persistent nerve problems. Over one-half of the patients surveyed said symptoms lasted for more than a year, and eighty percent characterized symptoms as severe.     The Cohen paper recommended further investigation of the association between fluoroquinolones and peripheral neuropathy. The study concluded with the following advisory: "If the occurrence of fluoroquinolone-associated ADEs of this severity and duration is confirmed, physicians need to be informed and warnings might be considered for these drugs' product information."

49.     Beyond the numerous safety signals generated by internal postmarketing review and the medical literature, Defendants were also put on notice of an association between fluoroquinolone use and peripheral neuropathy by the FDA, in 2001 and again in 2003.

50.     In 2001, the Division of Drug Risk Evaluation within the Office of Drug Safety uncovered 35 reports of quinolone-associated peripheral neuropathy and 46 cases of potentially prolonged paresthesia collected by the FDA's Adverse Event Reporting System ("AERS") for the quinolone class (including reports for ciprofloxacin, ofloxacin, and levofloxacin). Twenty-eight of these cases lasted over one month, with some patients still experiencing symptoms two years after fluoroquinolone use.

51.     In 2003, FDA's Office of Drug Safety conducted an additional post-marketing safety review of the AEs reported in the FDA's AERS for those who had been treated with ciprofloxacin (Cipro), ofloxacin (Floxin), and/or levofloxacin (Levaquin). The AERS contained 108 unduplicated

cases reported as peripheral neuropathy, or events suggestive of peripheral neuropathy, lasting at least one month in patients who had been treated with ciprofloxacin, ofloxacin and/or levofloxacin. As noted in the FDA's Office of Drug Safety review report dated June 10, 2003, the cases were temporally associated with fluoroquinolones, with a median time to onset of a few days. Gender distribution was approximately equal. The report further stated that these cases provided an indication that the fluoroquinolones could have been responsible for the prolonged peripheral neuropathies. As a result of its review, the Office of Drug Safety recommended that "peripheral neuropathy" be added to the labeling for ciprofloxacin and levofloxacin as it had been for ofloxacin.

52.    In September 2004, Defendants amended the labeling for Cipro (ciprofloxacin) and Levaquin (levofloxacin). The amended label contained the following statement in the Warnings section:

> **Peripheral Neuropathy:** Rare cases of sensory or sensorimotor axonal polyneuropathy affecting small and/or large axons resulting in paresthesias, hypoesthesias, dysesthesias and weakness have been reported in patients receiving quinolones, including levofloxacin. Levofloxacin should be discontinued if the patient experiences symptoms of neuropathy including pain, burning, tingling, numbness, and/or weakness or other alterations of sensation including light touch, pain, temperature, position sense, and vibratory sensation in order to prevent the development of an irreversible condition.

53.    In August of 2013, after mounting evidence of the relationship between fluoroquinolones and severe, long-term peripheral neuropathy, the FDA determined that Defendants' existing warnings regarding peripheral neuropathy were inadequate. On August 15, 2013, an updated warning and accompanying safety communication was issued in which the risk of rapid onset of irreversible peripheral neuropathy was finally included in the labels for all fluoroquinolones, including Cipro and Avelox and their generic counterparts, including ciprofloxacin. The updated warning also removed the statement that peripheral neuropathy occurred only in "rare" cases:

11

Cases of sensory or sensorimotor axonal polyneuropathy affecting small and/or large axons resulting in paresthesias, hypoesthesias, dysesthesias and weakness have been reported in patients receiving fluoroquinolones, including [drug name].  Symptoms may occur soon after initiation of [drug name] and may be irreversible.   [Drug name] should be discontinued immediately if the patient experiences symptoms of neuropathy including pain, burning, tingling, numbness, and/or weakness or other alterations of sensation including light touch, pain, temperature, position sense, and vibratory sensation.

54.     Upon information and belief, this updated information was not contained in the label or prescribing information that was provided by Cobalt to Plaintiff and her prescribers.

55.     Upon information and belief, it was not until after Plaintiff had been prescribed ciprofloxacin in November of 2013 that Cobalt updated its label and other product information in compliance with the August 2013 labeling mandate from the FDA.

56.     In any event, the label provided to the prescriber and the patient information provided to Ms. Akman were insufficient to warn of the risks of irreversible nerve damage along with other systemic injuries, including but not limited to, plantar fasciitis.  In addition, the label and patient information did not adequately warn against the use of ciprofloxacin for the treatment of urinary tract infection which should only be done as a last resort where there is no alternative therapy recommended.

57.     Additionally, Defendants' updated label does not disclose the serious, progressive and disabling nature of FLQ-induced irreversible peripheral neuropathy.

58.     Upon information and belief, Defendants failed to provide adequate information to the medical community about the frequency with which AEs indicative of peripheral neuropathy were being reported. Prior to the August 2013 label change, Defendants knew or should have known that FLQ-associated neuropathies could be rapid, permanent, and disabling, and that such injuries were not, as they had been stating, "rare." For instance, from September 2004 through August 2013, the FLQ labels stated that "Rare cases of polyneuropathy affecting small and/or large axons resulting in *paresthesias*, hypoesthesias, dysesthesias and weakness have been reported in

patients receiving quinolones" (emphasis added). The pre-2013 FLQ labels further represented that "the most common adverse drug reactions ($\geq$3%) are nausea, headache, diarrhea, insomnia, constipation, and dizziness."

59.     Defendants' failure to adequately warn physicians resulted in: (1) patients receiving FLQs instead of another acceptable and adequate non-fluoroquinolone antibiotic, sufficient to treat the illness for which patients presented to the provider; and (2) physicians failing to warn and instruct consumers about the risk of long-term peripheral nervous system injuries associated with FLQs.

60.     The failure of Defendants to include appropriate warnings in their products' labels as published to the medical community also resulted in an absence of adequate warnings in patient information presented directly to consumers, either as part of samples packages or as part of the prescription they received from retail pharmacies.

61.     Despite Defendants' knowledge and failure to adequately warn Plaintiff and her physicians of the above, Defendants continued to market FLQs as a first-line therapy for common bronchitis, sinusitis and other non-life threatening bacterial infections—conditions for which many safer antibiotics were and are available.

62.     In January of 2014, Ayad Ali published "Peripheral neuropathy and Guillain-Barré syndrome risks associated with exposure to systemic fluoroquinolones: a pharmacovigilance analysis," which reemphasized the link between fluoroquinolones and peripheral neuropathy and called for increased scrutiny of the risk-benefit of fluoroquinolone prescriptions.

63.     An epidemiologic study published in the August 2014 online edition of *Neurology* provided further quantitative support for the association between fluoroquinolone antibiotics and

peripheral neuropathy.[11] The study compared 6,226 cases of peripheral neuropathy among men ages 48-80 to 24,904 controls and determined that those on fluoroquinolones were at a statistically significant higher risk of developing peripheral neuropathy (RR = 1.83, 95% CI: 1.49-2.27), with current users having the highest risk of exposure (RR = 2.07, 95% CI: 1:56-2.74).

64.     On November 5, 2015, the FDA held a joint meeting of the Antimicrobial Drugs Advisory Committee and the Drug Safety and Risk Management Advisory Committee to discuss the safety and efficacy of systemic fluoroquinolones in the context of three indications: acute bacterial sinusitis (ABS), acute bacterial exacerbation of chronic bronchitis in those with chronic obstructive pulmonary disease (ABECB-COPD), and uncomplicated urinary tract infections (uUTI).  The FDA asked committee members to determine whether the benefits of FLQ therapy in these three indications justifies the associated risks of FLQ use.

65.     While fluoroquinolones are currently approved for these three indications, FDA reviewers, along with over 30 open public hearing speakers, voiced the need for stronger labels on these indications due to the modest or absent treatment benefits of the drugs for the three indications, and the serious adverse events associated with their use.  These serious adverse events include tendonitis, tendon rupture, central nervous system effects, peripheral neuropathy, myasthenia gravis exacerbation, phototoxicity, hypersensitivity and certain cardiovascular effects (i.e., QT prolongation).

66.     In advance of the advisory committee meeting, FDA reviewers released briefing documents that indicated the potential side effects of fluoroquinolone use, including permanent peripheral neuropathy, may outweigh the benefits provided by the medications, as patients often receive the drugs for infections that resolve themselves or can be treated with medications that do

---

[11] Etminan M, Brophy JM, Samii A. Oral fluoroquinolone use and risk of peripheral neuropathy: A pharmacoepidemiologic study. *Neurology* 2014; Epub 2014 Aug 22.

not carry the same risks.  For instance, an evaluation of placebo-controlled trials in ABS or mild ABECB-COPD showed that a large proportion of patients randomized to receive placebo recovered and thus the illnesses appeared to be self-limited for many.  Moreover, some trials failed to show any differences in outcome measures when comparing the antibacterial drug to placebo.

67.     A lengthy review of serious and sometimes permanent adverse events, including permanent peripheral neuropathy, associated with FLQ use followed the discussion of questionable efficacy for the three indications in question.  The FDA cited specifically adverse event reporting from patients highlighting a "constellation of symptoms" referred to as "Fluoroquinolone-Associated Disability" (FQAD).  Individuals with FQAD were defined by the FDA as patients who were prescribed an oral fluoroquinolone to treat urinary tract infections, bronchitis or sinusitis, and who experienced disabling adverse events, lasting 30 days or longer, in two of the following body systems: neuromuscular, neuropsychiatric, peripheral neuropathy, senses, skin, cardiovascular.

68.     After hearing testimony from industry representatives, as well as dozens of individuals who described a wide range of harmful effects on their health and cognitive ability from fluoroquinolone use, the panel voted overwhelmingly that the benefits and risks for systemic fluoroquinolone drugs do not support the current labeled indications for the treatment of ABS (unanimous), ABECB-COPD (18-2, with one abstention), or uncomplicated urinary tract infection (20-1).

69.     The Bayer Defendants have publicly acknowledged that FLQs can cause neuropathy.  At the FDA's joint advisory committee meeting in November 2015, Dr. Susan Nicholson, Vice-President of safety, surveillance, and risk management for the Johnson & Johnson Family of Companies, testified on behalf of Janssen Pharma and the other industry partners, including the

Bayer Defendants.[12] Dr. Nicholson was asked the following question by the FDA subcommittee concerning quinolones and their causal relationship to tendon ruptures, severe arrhythmia, *and neuropathy*:

> Q:   Dr. Winterstein [FDA]: So for the tendon piece, I think there is a fairly good body of literature now that looks at collagen tissue. And to me, that seems to be also a plausible mechanism for neuropathy. So I guess my question is, number one, when does it have to be a unified mechanism or what exactly did that refer to? And then number two, *does the sponsor disagree*, number one, that quinolones cause tendon ruptures, that quinolones cause severe arrhythmia, and then number three, *that quinolones cause neuropathy?* . . . So I'm just trying to get my arms around what the issue is here. *But it seems like we agree that there is a causal association with these three outcomes that we are discussing. Yes?*
>
> A:   Dr. Nicholson: *Yes. We do agree.*

70.   In *Conte v. Wyeth, Inc.*, 168 Cal. App. 4th 89, 94 (Cal. Ct. App. 2008), the court held that under California law "the common law duty to use due care owed by a name-brand prescription drug manufacturer when providing product warnings extends not only to consumers of its own product, but also to those whose doctors foreseeably rely on the name-brand manufacturer's product information when prescribing a medication, even if the prescription is filled with the generic version of the prescribed drug."

71.   In *Wyeth, Inc. v. Weeks,* 159 So.3d 649, 676 (Ala. 2014), the court held "[u]nder Alabama Law, a brand-name-drug company may be held liable for fraud or misrepresentation (by misstatement or omission), based on statements it made in connection with the manufactur of a brand-name prescription drug, by a plaintiff claiming physical injury caused by a generic drug manufactured by a different company." The Alabama Legislature subsequently passed legislation

---

[12] As noted at the meeting by Melissa Tokosh, global regulatory leader with Janssen Research and Development, "Our participation [at this hearing] represents a collaborative effort between both branded and generic companies, with Bayer and Janssen leading the preparation of the background documents and presentation based on data from our products."

that was signed into law prohibiting claims by generic consumers against brand-name manufacturers, effectively overruling the Alabama Supreme Court's ruling in *Weeks*. The law took effect November 1, 2015, thus barring any such cause of action filed after that date.

72.     In *Kellogg v.* Wyeth, 762 F.Supp.2d 694, 709 (D.Vt. 2010), the court held "under Vermont's negligence law it is reasonably foreseeable that a physician will rely upon a brand name manufacturer's representations—or the absence of representations—about the risk of side effects of its drug, when deciding to prescribe the drug for a patient, regardless of whether the pharmacist fills the prescription with a generic form of the drug. Vermont allows a negligence action against one who owes a duty of care and fails to conform to the standard of conduct required."

73.     In Dolin *v. Smithkline Beecham Corp.*, 62 F.Supp.3d 705, 720-21 (N.D. Ill. 2014), the court held that under Illinois common law, a brand-name manufacturer owes a duty of care to the generic consumer.

74.     In the District of Columbia, Bayer's duty of care in maintaining and disseminating product information extends to Ms. Akman who has been injured by the ingestion of generic ciprofloxacin.  Bayer knew or should have known that prescribers would rely on the warnings and product labeling and information that it had disseminated in prescribing ciprofloxacin to patients, including Ms. Akman.

## COUNT I
### [Strict Liability]

75.     Plaintiff re-allege all prior paragraphs of the Complaint as if set out here in full.

76.     The FLQ drugs manufactured, marketed, supplied and/or distributed by Defendants were defective at the time of manufacture, development, production, testing, inspection, endorsement, prescription, sale and distribution in that warnings, instructions and directions accompanying such labels failed to warn of the dangerous risks they posed, including the risk of developing irreversible peripheral neuropathy.

17

77.     At all times alleged herein, the FLQs manufactured, marketed, supplied, and/or distributed by Defendants were defective, and Defendants knew that FLQ drugs were to be used by consumers without inspection for defects.   Moreover, Plaintiff, her prescribing physicians, and her healthcare providers neither knew nor had reason to know at the time of Plaintiff's use of the drugs of the aforementioned defects.   Ordinary consumers would not have recognized the potential risks for which Defendants failed to include the appropriate warnings.

78.     At all times alleged herein, the Defendants' FLQs were prescribed to and used by Plaintiff as intended by Defendants and in a manner reasonably foreseeable to Defendants.

79.     The design of Defendants' FLQ drugs were defective in that the risks associated with using the drugs as a first-line therapy for infections that did not dictate the use of an FLQ outweighed any benefits of their design. Any benefits associated with the use of the FLQs in such situations were either relatively minor or nonexistent and could have been obtained by the use of other, alternative treatments and products that could equally or more effectively reach similar results but without the increased risk of developing irreversible peripheral neuropathy.

80.     The defect in design existed when the products left Defendants' possession.

81.     At the time FLQs left the control of Defendants, Defendants knew or should have known of the risks associated with ingesting their drug.

82.     As a result of the defective condition of Defendants' FLQs, Plaintiff suffered the injuries and damages alleged herein.

WHEREFORE, Plaintiff respectfully request that this Court enter judgment in her favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.

## COUNT II
### [Product Liability – Failure to Warn]

83.     Plaintiff re-alleges all prior paragraphs of the Complaint as if set out here in full.

84.     Defendants have engaged in the business of selling, distributing, supplying, manufacturing, marketing, and/or promoting FLQ drugs and, through that conduct, have knowingly and intentionally placed such drugs into the stream of commerce with full knowledge that their products reach consumers such as Plaintiff who ingested them.

85.     Defendants did in fact sell, distribute, supply, manufacture, and/or promote their FLQ drugs to Plaintiff and to her prescribing physicians.  Additionally, Defendants expected the drugs they were selling, distributing, supplying, manufacturing, and/or promoting to reach – and they did in fact reach – prescribing physicians and consumers, including Plaintiff and her prescribing physicians, without any substantial change in the condition from when they were initially distributed by Defendants.

86.     At all times herein mentioned, Defendants' FLQ drugs were defective and unsafe in manufacture such that they was unreasonably dangerous to the user, and were so at the time they were distributed by Defendants and ingested by Plaintiff.  The defective condition of such drugs was due in part to the fact that they were not accompanied by proper warnings regarding the possible side effect of developing long-term and potentially irreversible peripheral neuropathy as a result of their use.

87.     This defect caused serious injuries to Plaintiff, who used Defendants' FLQs in their intended and foreseeable manner.

88.     At all times herein mentioned, Defendants had a duty to properly design, manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain supply,

provide proper warnings, and take such steps to assure that their products did not cause users to suffer from unreasonable and dangerous side effects.

89.     Defendants so negligently and recklessly labeled, distributed, and promoted the aforesaid products that they were dangerous and unsafe for the use and purpose for which they were intended.

90.     Defendants negligently and recklessly failed to warn of the nature and scope of the side effects associated with their FLQ products, namely irreversible peripheral neuropathy.

91.     Defendants were aware of the probable consequences of the aforesaid conduct. Despite the fact that Defendants knew or should have known that their FLQ drugs caused serious injuries, they failed to exercise reasonable care to warn of the dangerous side effect of developing irreversible peripheral neuropathy from their use, even though this side effect was known or reasonably scientifically knowable at the time of their initial marketing and distribution. Defendants willfully and deliberately failed to avoid the consequences associated with their failure to warn, and in doing so, Defendants acted with a conscious disregard for the safety of Plaintiff.

92.     Plaintiff could not have discovered any defect in the subject products through the exercise of reasonable care.

93.     Defendants as the manufacturers and/or distributors of the FLQ products, are held to the level of knowledge of experts in the field.

94.     Plaintiff reasonably relied upon the skill, superior knowledge, and judgment of Defendants.

95.     Defendants Cobalt and Actavis knew or should have known that the FDA had updated their label and safety and prescriber information in August of 2013 but did not include that information in its label and safety information in November of 2013, thereby breaching their duty and failing to reasonably warn prescribers or patients about the risks of ciprofloxacin.

96.     Had Defendants properly disclosed the risks associated with their FLQ drugs, Plaintiff would have avoided the risk of irreversible peripheral neuropathy by not using the drugs.

97.     As a direct and proximate result of the carelessness, negligence, recklessness, and gross negligence of Defendants alleged herein, and in such other ways to be later shown, the subject product caused Plaintiff to sustain injuries as herein alleged.

WHEREFORE, Plaintiff respectfully request that this Court enter judgment in her favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.  Plaintiff also demand that the issues herein contained be tried by a jury.

## COUNT III
### [Negligence]

98.     Plaintiff re-alleges all prior paragraphs of the Complaint as if set out here in full.

99.     At all times material hereto, Defendants had a duty to exercise reasonable care to consumers, including Plaintiff herein, in the design, development, manufacture, testing, inspection, packaging, promotion, marketing, distribution, labeling, and/or sale of the FLQ drugs.

100.    Defendants breached their duty of reasonable care to Plaintiff in that they negligently promoted, marketed, distributed, and/or labeled the drugs.

101.    Plaintiff's injuries and damages alleged herein were and are the direct and proximate result of the carelessness and negligence of Defendants, including, but not limited to, one or more of the following particulars:

a)      In the design, development, research, manufacture, testing, packaging, promotion, marketing, sale, and/or distribution of Defendants' FLQ drugs;

b)      In failing to warn or instruct, and/or adequately warn or adequately instruct, users of the subject product, including Plaintiff herein, of the

21

dangerous and defective characteristics of Defendants' FLQ drugs;

c)      In the design, development, implementation, administration, supervision, and/or monitoring of clinical trials for Defendants' FLQ drugs;

d)      In promoting Defendants' FLQ drugs in an overly aggressive, deceitful, and fraudulent manner, including as a first-line therapy to treat infections for which they were not required despite evidence as to the drug's defective and dangerous characteristics due to its propensity to cause irreversible peripheral neuropathy;

e)      In representing that Defendants' FLQ drugs were safe for their intended use when, in fact, the products were unsafe for their intended use;

f)      In failing to perform appropriate pre-market testing of Defendants' FLQ drugs;

g)      In failing to perform appropriate post-market surveillance of Defendants' FLQ drugs;

h)      In failing to adequately and properly test Defendants' FLQ drugs before and after placing them on the market;

i)      In failing to conduct sufficient testing on Defendants' FLQ drugs which, if properly performed, would have shown that it had the serious side effect of causing irreversible peripheral neuropathy;

j)      In failing to adequately warn Plaintiff and her healthcare providers that the use of Defendants' FLQ drugs carried a risk of developing irreversible peripheral neuropathy. In fact, prior to August 2013, Defendants were aware that their FLQ labels did not warn about irreversible peripheral neuropathy.

k)      In failing to provide adequate post-marketing warnings or instructions after Defendants knew or should have known of the significant risk of irreversible peripheral neuropathy associated with the use of their FLQ drugs; and

22

l)    In failing to adequately and timely inform Plaintiff and the healthcare industry of the risk of serious personal injury, namely irreversible peripheral neuropathy, from FLQ ingestion as described herein.

102.    Defendants Cobalt and Actavis knew or should have known that the FDA had updated their label and safety and prescriber information in August of 2013 but did not include that information in its label and safety information in November of 2013, thereby breaching their duty and failing to reasonably warn prescribers or patients about the risks of ciprofloxacin.

103.    Defendants knew or should have known that consumers, such as Plaintiff, would foreseeably suffer injury as a result of Defendants' failure to exercise reasonable and ordinary care.

104.    As a direct and proximate result of Defendants' carelessness and negligence, Plaintiff suffered severe and permanent physical and emotional injuries, including, but not limited to, irreversible peripheral neuropathy. Plaintiff has endured pain and suffering, physical impairment, suffered economic loss, including incurring significant expenses for medical care and treatment, and will continue to incur such expenses in the future. Plaintiff seeks actual and punitive damages from Defendants as alleged herein.

WHEREFORE, Plaintiff respectfully request that this Court enter judgment in her favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.

### COUNT IV
### [Breach of Express Warranty]

105.    Plaintiff re-alleges all prior paragraphs of the Complaint as if set out here in full.

106.    Before Plaintiff was first prescribed Defendants' FLQ drugs and during the period in which they used the drugs, Defendants expressly warranted that their FLQ drugs were safe.

107.    Defendants' FLQs did not conform to these express representations because their drugs were not safe and had an increased risk of serious side effects, including irreversible peripheral neuropathy, whether taken individually or in conjunction with other therapies.

108.    As a direct and proximate result of this wrongful conduct, Plaintiff were injured as described above.

WHEREFORE, Plaintiff respectfully request that this Court enter judgment in her favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.

## COUNT V
### [Breach of Implied Warranty]

109.    Plaintiff re-alleges all prior paragraphs of the Complaint as if set out here in full.

110.    At all times mentioned herein, Defendants manufactured, compounded, packaged, distributed, recommended, merchandised, advertised, promoted, supplied, and/or sold FLQ drugs (including Cipro, Avelox and Levaquin), and before such drugs were prescribed to Plaintiff, Defendants impliedly warranted to Plaintiff that these drugs were of merchantable quality and safe and fit for the use for which they were intended.

111.    Plaintiff, individually and through her prescribing physicians, reasonably relied upon the skill, superior knowledge, and judgment of Defendants.

112.    Plaintiff was prescribed, purchased, and used the subject products for their intended purpose.

113.    Due to Defendants' wrongful conduct as alleged herein, Plaintiff could not have known about the nature of the risks and side effects associated with the subject products until after they used them.

114.    Contrary to the implied warranty for the subject products, Defendants' FLQs are not of merchantable quality, and they were neither safe nor fit for their intended uses and purposes, as alleged herein.

115.    As a direct and proximate result of Defendants' breach of implied warranty, Plaintiff suffered severe and permanent physical and emotional injuries, including, but not limited to, irreversible peripheral neuropathy. Plaintiff has endured pain and suffering, suffered economic loss, including incurring significant expenses for medical care and treatment, and will continue to incur such expenses in the future.  Plaintiff seek actual and punitive damages from Defendants as alleged herein.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.

## COUNT VI
### [Fraud]

116.    Plaintiff re-alleges all prior paragraphs of the Complaint as if set out here in full.

117.    Defendants, having undertaken to prepare, design, research, develop, manufacture, inspect, label, market, promote, and sell their FLQ drugs, owed a duty to provide accurate and complete information regarding these drugs.

118.    Defendants' advertising, marketing and educational programs, by containing affirmative misrepresentations and omissions, falsely and deceptively sought to create the image and impression that the use of FLQ drugs were safe for human use, had no unacceptable side effects, and would not interfere with daily life.

119.    Defendants did not properly study nor report accurately the results of their studies in terms of risks and benefits of its FLQ drugs. For instance, Defendants failed to investigate or initiate

any studies or testing following the safety signal generated by Karlman, et al. in 1988, wherein the study determined that an adverse event of peripheral paresthesia was "probably related" to ciprofloxacin treatment.

120.    Defendants purposefully concealed, failed to disclose, misstated, downplayed, and understated the health hazards and risks associated with the use of their FLQs.

121.    Cobalt and Actavis knew or should have known that the FDA had updated their label and safety and prescriber information in August of 2013 but did not include that information in its label and safety information in November of 2013;

122.    The Bayer Defendants were actively engaged in fraudulently and intentionally polluted the scientific literature related to safety and efficacy of their FLQ drugs. The Bayer Defendants did this primarily through selected Bayer physicians and other paid medical consultants and Key Opinion Leaders ("KOLs")—namely Peter Ball, Glenn Tillotson,[13] Lionel Mandell, B A. Lipsky, H. Lode, Ralf Stahlmann, and Robert Owens—who regularly touted benefits of these drugs while concealing, misstating, and downplaying the known adverse and serious health effects.[14] A sample of such statements include:

> "The most common adverse effects of the fluoroquinolones involve the gastrointestinal tract, skin and CNS, and are mainly mild and reversible." Ball, P., Mandell, L., Niki, Y., Tillotson, G. **Comparative tolerability of the newer fluoroquinolone antibacterials.** *Drug Saf.* 1999;21:407–421.

---

[13] In 2000, Glenn Tillotson was the director of international scientific relations at Bayer Corporation and co-developer of Cipro and Avelox. According to one of his online biographies: "After training in medical microbiology and infectious diseases in the United Kingdom he subsequently spent 13 years at Bayer AG in the UK, US and Germany where he was instrumental in the development of ciprofloxacin and moxifloxacin as well as other drugs in the Bayer AG portfolio." *See* http://antibiotics.omicsgroup.com/ocm/2015/glenn-s-tillotson-senior-scientific-advisor-of-optimer-pharmaceuticals-inc-usa.

[14] *See, e.g.*, Tillotson, G.S., Rybak, J. **New milestones achieved in fluoroquinolone safety.** *Pharmacotherapy.* 2001;21:358–360; Tillotson, G.S., Ball, P. **Fluoroquinolone safety profiles—a review.** in: *Today's Therapeutic Trends.* 1. 3rd ed. Communications Media for Education Inc; 2003:419–435.

"Ciprofloxacin is well tolerated; the incidence of adverse events is low and serious adverse events are rare." Ball, P. **Safety of the new fluoroquinolones compared with ciprofloxacin.** *J Chemother.* 2000;12:8–11.

"A review of 37 published clinical trials in more than 3,500 patients, as well as data obtained from Bayer Corporation, revealed that ciprofloxacin performed as well as or better than the standard comparison drugs. . . . The clinical efficacy of these [FLQ] compounds has largely been demonstrated to be equivalent to that of commonly prescribed agents." Ball, P., Chodosh, S., Grossman, R., Tillotson, G., Wilson, R. Causes, Epidemiology, and Treatment of Bronchial Infections, Infect Med. 2000; 17(3).

"The fluoroquinolone group has made a major contribution to the care of infected patients for over 15 years. Recent problems with idiosyncratic, unexpected and serious adverse reactions have affected very small numbers of patients and, whilst leading to the loss of the individual agents concerned, should not raise concerns about the class as a whole without scientific foundation. . . . After treatment of almost 20 million patients with these newer agents, their window of opportunity appears unlikely to be cut short by untimely reports of significant adverse reactions." Ball, P. Adverse drug reactions: implications for the development of fluoroquinolones. *Journal of Antimicrobial Chemotherapy* (2003) 51, *Suppl. S1*, 21–27.

123.   In fact, when the first major epidemiological study suggesting the permanency of peripheral neuropathy associated with FLQ use was published by Cohen (2001) in the *Annals of Pharmacotherapy*, Glenn Tillotson, Bayer's director and the co-developer of Cipro and Avelox—quickly sought to downplay the significance of Cohen's findings.[15] It is not coincidental that the publication dates of the industry-driven articles cited above correspond to the timeframe when FLQs became the most commonly prescribed class of antibiotics to adults in the United States.[16]

124.   Thus, Defendants, through the publication of medical literature, deceived potential users and prescribers of FLQ drugs by relaying only allegedly positive information, while concealing,

---

[15] Tillotson, GS. Comment: peripheral neuropathy syndrome and fluoroquinolones. *Ann Pharmacother.* 2001 Dec;35(12):1673-4.
[16] *See* Linder, JA. et al., Fluoroquinolone prescribing in the United States: 1995 to 2002. *Am J Med.* 2005 Mar;118(3):259-68 ("Fluoroquinolone prescribing increased threefold in outpatient clinics and emergency departments in the United States from 1995 to 2002. Fluoroquinolones became the most commonly prescribed class of antibiotics to adults in 2002.").

misstating, and downplaying the known adverse and serious health effects, including permanent peripheral neuropathy.

125.   Defendants similarly used promotional practices to deceive potential users and prescribers of FLQ drugs by relaying only allegedly positive information, while concealing, misstating, and downplaying the known adverse and serious health effects, including permanent peripheral neuropathy.

126.   Defendants also falsely and deceptively kept relevant information from potential FLQ users and minimized prescriber concerns regarding the safety and efficacy of FLQs. For instance, despite learning as early as 1988 (Karlman, et al.) that there was reasonable evidence of an association of a serious hazard with its FLQs, Defendants intentionally withheld this information from physicians and patients until September 2004, when the FLQ labeling was finally changed to reflect any risk of developing neuropathy. Even then, however, Defendants sought to minimize the frequency and permanency of these serious events by indicating that they were "rare" and in any event reversible. Defendants knew these labeling statements were false and misleading, because they knew as early as the 1990s that central nervous system-related effects were more common with quinolones than with other antimicrobial classes of drugs and that the onset of events like peripheral neuropathy could be rapid and irreversible.

127.   Defendants also continued, through August 2013, to intentionally misrepresent that irreversible neuropathy could be avoided by simply discontinuing the drug upon the onset of symptoms. More specifically, until the August 2013 label change, Defendants' FLQ labels specifically stated that the drugs should be "discontinued if the patient experiences symptoms of neuropathy . . . in order to prevent the development of an irreversible condition." This statement is misleading because it implies that permanent peripheral neuropathy could be avoided by simply discontinuing the drug upon the onset of symptoms, which, as noted above, is false.

128.    The scientific and medical communities were misled as to the true nature of the risk and benefits of the Defendants' FLQ drugs in particular and in general as to the treatment needs and options for patients in need of antibiotic therapy.  It was not until the FLQ label change in August 2013 regarding the rapid onset and potentially permanent nature of  neuropathies that the truth began to be generally available in the scientific community. Even then, however, physicians had been so conditioned by the false science published and/or funded for years by Defendants that it was difficult for many of those physicians to accept the truth about the risks and lack of benefits associated with these FLQ drugs. This realization, that FLQ drugs have for years been overprescribed, which is supported by independent studies,[17] has once again prompted the FDA to take action. In November 2015, a FDA subcommittee advisory panel was convened wherein panel members noted that FLQ drugs are overprescribed for common infections when other treatments would work as well with less risk. The advisory panel called on the FDA to strengthen labeling warnings and clarify when FLQ drugs should—and should not—be used.

129.    The misconceptions as to the true risks and benefits of Defendants' FLQ drugs were pervasive throughout the medical and scientific communities due to the marketing methods employed by Defendants that included the following:

(a)    The publication of fraudulent scientific papers in scientific and medical literature;

(b)    Providing false and misleading information to doctors during sales and detailing calls at the doctors' offices or at medical or scientific conferences and meetings;

(c)    Funding and sponsoring physicians, consultants and/or Key Opinion

---

[17] *See* Lautenbach E, Larosa LA, Kasbekar N, Peng HP, Maniglia RJ, Fishman NO. Fluoroquinolone utilization in the emergency departments of academic medical centers: prevalence of risk factors for inappropriate use. Arch Intern Med. 2003;163(5):601–605.

Leaders to disseminate false and misleading scientific and medical information through medical journals and publications;

(d)     Funding third-party companies (including DesignWrite, LLC) to disseminate false and misleading scientific and medical information through its publications and its members to physicians and patients;

(e)     Funding continuing medical education to disseminate false and misleading information to doctors;

(f)     Paying specialists in the field to meet with prescribing doctors for the purpose of disseminating false and misleading information about the risks and benefits of the FLQ drugs;

(g)     Disseminating direct to consumers advertising to drive patients to their doctors' offices to ask for their FLQ drugs based on false and misleading information regarding the risks and benefits of the drugs.

130.    In particular, Defendants falsely and deceptively misrepresented material facts regarding the safety and effectiveness of FLQ drugs and fraudulently, intentionally, and/or negligently concealed material information, including adverse information, regarding the safety and effectiveness of their products, including by concealing the following information:

(a)     That there was evidence of peripheral paraesthesia associated with FLQ therapy as early as 1988;

(b)     That there was evidence demonstrating that FLQs increase the risk of irreversible peripheral neuropathy as early as 1996;

(c)     Cobalt and Actavis knew or should have known that the FDA had updated their label and safety and prescriber information in August of 2013 but did not include that information in its label and safety information in November of 2013;

(d)     That the FLQ drugs were not fully and adequately tested by Defendants

30

and/or their predecessor for the risk of developing irreversible peripheral neuropathy;

(e) The severity, frequency, rapid onset, and potentially disabling nature of peripheral neuropathy caused by the FLQ drugs;

(f) The wide range of injuries caused by FLQ drugs to multiple body systems (e.g., musculoskeletal, neuropsychiatric, peripheral nervous system, senses like vision or hearing, skin, and cardiovascular); and

(g) That FLQs should not be used as a first-line therapy to treat infections for which they are not required.

131. The misrepresentations and/or active concealments were perpetuated directly and/or indirectly by Defendants. Moreover, as a result of these efforts it was accepted by the medical and scientific communities that these FLQ drugs had a certain risk benefit profile that was shown to be completely false by independent studies, case series, and individual AE reports (including those contained in the FDA AERS).

132. Defendants were in possession of evidence demonstrating that the FLQ drugs caused serious and sometimes debilitating side effects, including permanent peripheral neuropathies. Nevertheless, Defendants continued to market such products by providing false and misleading information with regard to its safety and efficacy to Plaintiff and Plaintiff's treating physicians.

133. Defendants knew or should have known that these representations were false, and they made the representations with the intent or purpose of deceiving Plaintiff, her prescribing physicians, and the healthcare industry generally.

134. Defendants made these false representations with the intent or purpose that Plaintiff, her prescribing physicians, and the healthcare industry would rely on them, leading to the widespread use of FLQs by Plaintiff as well as the general public.

135.    At all times herein mentioned, neither Plaintiff nor her physicians were aware of the falsity or incompleteness of the statements being made by Defendants and believed them to be true.  Had they been aware of these facts, Plaintiff's physicians would not have prescribed and Plaintiff would not have taken these FLQ drugs.

136.    Plaintiff, her prescribing physicians, and the healthcare industry justifiably relied on and/or were induced by Defendants' misrepresentations and/or active concealment and relied on the absence of information regarding the dangers of FLQs that Defendants did suppress, conceal, or fail to disclose to Plaintiff's detriment.  Plaintiff justifiably relied, directly or indirectly, on Defendants' misrepresentations and/or active concealment regarding the true dangers of FLQs. Based on the nature of the physician-patient relationship, Defendants had reason to expect that Plaintiff would indirectly rely on Defendants' misrepresentations and/or active concealment.

137.    As a result of the concealment and/or suppression of the material facts set forth above, Plaintiff ingested the Defendants' FLQ drugs and suffered injuries as set forth herein.

WHEREFORE, Plaintiff respectfully request that this Court enter judgment in her favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.

## COUNT VII
### [Negligent Misrepresentation]

138.    Plaintiff re-alleges all prior paragraphs of the Complaint as if set out here in full.

139.    Defendants negligently and/or recklessly misrepresented to Plaintiff, her prescribing physicians, and the healthcare industry the safety and effectiveness of FLQs and/or recklessly and/or negligently concealed material information, including adverse information, regarding the safety, effectiveness, and dangers posed by FLQ drugs.

140.    Defendants made reckless or negligent misrepresentations and negligently or recklessly concealed adverse information when Defendants knew, or should have known, that FLQs had defects, dangers, and characteristics that were other than what Defendants had represented to Plaintiff, Plaintiff's physicians and the healthcare industry generally.   Specifically, Defendants negligently or recklessly concealed from Plaintiff, her prescribing physicians, the health care industry, and the consuming public that:

    (a)    That there was evidence (e.g., Karlman, et al.) of peripheral paraesthesia associated with FLQ therapy (ciprofloxacin) as early as 1988;

    (b)    That there was evidence (e.g., Hedenmalm, et al.) demonstrating that FLQs increase the risk of irreversible peripheral neuropathy as early as 1996;

    (c)    That the FLQ drugs were not fully and adequately tested by Defendants and/or their predecessor for the risk of developing irreversible peripheral neuropathy;

    (d)    The severity, frequency, rapid onset, and potentially disabling nature of peripheral neuropathy caused by the FLQ drugs;

    (e)    The wide range of injuries caused by FLQ drugs to multiple body systems (e.g., musculoskeletal, neuropsychiatric, peripheral nervous system, senses like vision or hearing, skin, and cardiovascular); and

    (f)    That FLQs should not be used as a first-line therapy for minor or uncomplicated infections.

141.    Cobalt and Actavis knew or should have known that the FDA had updated their label and safety and prescriber information in August of 2013 but did not include that information in its label and safety information in November of 2013;

142.    The negligent or reckless misrepresentations and/or negligent or reckless failures to disclose were perpetuated directly and/or indirectly by Defendants.

33

143.   Defendants should have known through the exercise of due care that these representations were false, and they made the representations without the exercise of due care leading to the deception of Plaintiff, her prescribing physicians, and the healthcare industry.

144.   Defendants made these false representations without the exercise of due care knowing that it was reasonable and foreseeable that Plaintiff, her prescribing physicians, and the healthcare industry would rely on them, leading to the use of FLQs by Plaintiff as well as the general public.

145.   At all times herein mentioned, neither Plaintiff nor her physicians were aware of the falsity or incompleteness of the statements being made by Defendants and believed them to be true.   Had Plaintiff been aware of said facts, her physicians would not have prescribed and Plaintiff would not have taken the FLQ drugs.

146.   Plaintiff justifiably relied on and/or were induced by Defendants' negligent or reckless misrepresentations and/or negligent or reckless failure to disclose the dangers of Defendants' FLQ drugs and relied on the absence of information regarding the dangers of these drugs which Defendants negligently or recklessly suppressed, concealed, or failed to disclose to Plaintiff's detriment.

147.   Defendants had a post-sale duty to warn Plaintiff, her prescribing physicians, and the general public about the potential risks and complications associated with their FLQ drugs in a timely manner.

148.   Defendants made the representations and actively concealed information about the defects and dangers of their FLQ drugs with the absence of due care such that Plaintiff's prescribing physicians and the consuming public would rely on such information, or the absence of information, in selecting these FLQs as a treatment.

149.    As a result of the negligent or reckless concealment and/or the negligent or reckless failure to provide materials facts as set forth above, Plaintiff ingested Defendants' FLQ drugs and suffered injuries as set forth herein.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.

## COUNT VIII
### [Fraudulent Concealment]

150.    Plaintiff re-alleges all prior paragraphs of the Complaint as if set out here in full.

151.    Defendants are estopped from asserting a statute of limitations defense because they fraudulently concealed their wrongful conduct from the Plaintiff with the intent that Plaintiff and her prescribing physicians would rely on such material representations. First, Defendants had actual knowledge of the defective and dangerous nature of the FLQ drugs. Second, Defendants failed to conduct adequate testing on their FLQ drugs to establish safety and efficacy. Third, Defendants had actual knowledge of their misrepresentations, negligence, breach of warranties, and false, misleading, deceptive, and unconscionable conduct. Yet, Defendants continued to perpetuate their wrongful conduct with the intent and fixed purpose of concealing their wrongs from the Plaintiff and the public at large.

152.    Plaintiff and her prescribing physicians were unaware of the falsity of these representations, they acted in actual and justifiable reliance on such material misrepresentations, and Plaintiff were injured as a direct and proximate result.

153.    Additionally, Defendants knowingly omitted material information and remained silent regarding said misrepresentations despite the fact that they had a duty to inform Plaintiff, her prescribing physicians, and the general public of the inaccuracy of said misrepresentations, which

omission constitutes a positive misrepresentation of material fact, with the intent that Plaintiff and her prescribing physicians would rely on Defendants' misrepresentations.   Plaintiff and her prescribing physicians did, in fact, act in actual and justifiable reliance on Defendants' representations, and Plaintiff were injured as a result.

154.   Defendants, as the manufacturer and/or distributor of their FLQ drugs, were in a position of superior knowledge and judgment regarding any potential risks associated with their drugs.

155.   Defendants committed constructive fraud by breaching one or more legal or equitable duties owed to Plaintiff relating to the FLQ drugs at issue in this lawsuit, said breach or breaches constituting fraud because of its propensity to deceive others or constitute an injury to public interests or public policy.

156.   In breaching their duties to Plaintiff, Defendants used their position of trust as the manufacturer and/or distributor of FLQ drugs to increase sales of the drugs at the expense of informing Plaintiff that, by ingesting these drugs, they were placing themselves at a significantly-increased risk of developing irreversible peripheral neuropathy and/or injuries to multiple other body systems   (e.g., musculoskeletal, neuropsychiatric, senses like vision or hearing, skin, and cardiovascular).

WHEREFORE, Plaintiff respectfully request that this Court enter judgment in her favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.

## COUNT IX
### [Violation of Consumer Protection Laws/Consumer Fraud Laws]

157.   Plaintiff re-alleges all prior paragraphs of the Complaint as if set out here in full.

158.    Plaintiff pled this Count in the broadest sense available under the law, to include pleading same pursuant to all substantive law that applies to this case, as may be determined by choice of law principles, regardless of whether arising under statute and/or common law.

159.    Plaintiff used Defendants' FLQ drugs and suffered ascertainable losses as a result of Defendants' actions in violation of the consumer protection laws.

160.    Defendants used unfair methods of competition or deceptive acts or practices that were proscribed by law, including the following:

    (a) Representing that goods or services have characteristics, ingredients, uses, benefits, or quantities that they do not have;

    (b) Advertising goods or services with the intent not to sell them as advertised; and

    (c) Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion or misunderstanding.

161.    Defendants violated consumer protection laws through her use of false and misleading misrepresentations or omissions of material fact relating to the safety of their FLQ drugs.

162.    Defendants violated consumer protection laws of various states.

163.    Defendants uniformly communicated the purported benefits of their FLQ drugs while failing to disclose the serious and dangerous side effects related to the use of FLQs and of the true state of FLQs' safety, efficacy, and usefulness. Defendants made these representations to physicians, the medical community at large, and to patients and consumers, such as Plaintiff, in the marketing and advertising campaign described herein.

164.    Defendants' conduct in connection with their FLQ drugs were also impermissible and illegal in that it created a likelihood of confusion and misunderstanding, because Defendants misleadingly, falsely and or deceptively misrepresented and omitted numerous material facts regarding, among other things, the utility, benefits, costs, safety, efficacy and advantages of FLQs.

165.    As a result of these violations of consumer protection laws, Plaintiff has incurred and will incur serious physical injury, including but not limited to pain, suffering, loss of income, loss of opportunity, loss of family and social relationships, and medical, hospital and surgical expenses and other expense related to the diagnosis and treatment thereof, for which Defendants are liable.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.

## COUNT X
### UNLAWFUL AND DECEPTIVE TRADE PRACTICE – DC Code § 28-3905
### AS TO ACTAVIS AND COBALT

166.    Each of the preceding paragraphs is incorporated by reference herein.

167.    Plaintiff Jennifer Akman on behalf of herself as an individual and on behalf of the general public files this action pursuant to D.C. Code § 28-3905(k) (2013).

168.    The deceptive cirprofloxacin slack-filled product that Plaintiff purchased qualifies as an unlawful and deceptive trade practice pursuant to D.C. Code § 28-3904 in that Cobalt and/or Actavis:

      a.  Misrepresents a material fact and/or fails to state a material fact regarding the safety and appropriateness of their product;
      b.  Uses innuendo or ambiguity as to a material fact regarding the safety and appropriateness of their product;
      c.  Represents that goods or services have a source, sponsorship, approval, certification, accessories, characteristics, ingredients, uses, benefits, or quantities that they do not have;
      d.  Otherwise misleads.

169.    Sale of products with inadequate or incomplete warnings or safety information is an unlawful and deceptive trade practice under D.C. Code §28-3904 for materially misleading the consumer as the safety characteristics of the product.

38

170.    These material misrepresentations affect the Plaintiff and the general public's ability to make safe and informed decisions.

171.    Defendants intentionally made these misrepresentations knowing that they had the tendency to mislead consumers, such as Jennifer Akman.

172.    Sale of products in such packages with inadequate safety information constitutes an unfair trade practice.

173.    As a result of this unfair and deceptive trade practice, Plaintiff seeks statutory damages, punitive damages, and reasonable attorney's fees.

## PUNITIVE DAMAGES

174.    At all times material hereto, Defendants knew or should have known that their FLQ drugs were inherently dangerous with respect to the risk of irreversible peripheral neuropathy.

175.    At all times material hereto, Defendants attempted to misrepresent and did misrepresent facts concerning the safety of their FLQ drugs.

176.    Defendants' misrepresentations included knowingly withholding material information from the medical community and the public, including Plaintiff, concerning the safety of the FLQ drugs.

177.    At all times material hereto, Defendants knew and recklessly disregarded the fact that their FLQ drugs cause the chronic disease of irreversible peripheral neuropathy and/or injuries to multiple other body systems.

178.    Notwithstanding the foregoing, Defendants continued to aggressively market their FLQ drugs to consumers, including Plaintiff herein, without disclosing the aforesaid side effect.

179.    Defendants knew of their FLQ drug's lack of warnings regarding the risk of developing irreversible peripheral neuropathy and/or injuries to multiple other body systems, but

they intentionally concealed and/or recklessly failed to disclose that risk and continued to market, distribute, and/or sell their FLQ drugs without said warnings so as to maximize sales and profits at the expense of the health and safety of the public, including Plaintiff herein, in conscious and/or negligent disregard of the foreseeable harm caused by their FLQ drugs.

180.    Defendants' intentional and/or reckless failure to disclose information deprived Plaintiff of necessary information to enable them to weigh the true risks of using FLQs against their benefits.

181.    As a direct and proximate result of Defendants' willful, wanton, careless, reckless, conscious, and deliberate disregard for the rights and safety of their consumers, Plaintiff suffered severe and permanent physical and emotional injuries, including, but not limited to, irreversible peripheral neuropathy and/or injuries to multiple other body systems.   Plaintiff has endured pain and suffering, has suffered economic loss, including incurring significant expenses for medical care and treatment, and will continue to incur such expenses in the future. Plaintiff's injuries and damages are prolonged and/or permanent and will continue into the future.

182.    Defendants' aforesaid conduct was committed with knowing, conscious, careless, reckless, willful, wanton, and deliberate disregard for the rights and safety of consumers, including Plaintiff, thereby entitling Plaintiff to punitive damages in an amount appropriate to punish Defendants and deter them from similar conduct in the future.

## RELIEF REQUESTED

WHEREFORE, Plaintiff prays for relief and judgment against Defendants as follows:

(g)    For general (non-economic) and special (economic) damages in a sum in excess of the jurisdictional minimum of this Court;

(h)    For medical, incidental, and hospital expenses according to proof;

(i)    For pre-judgment and post-judgment interest as provided by law;

(j)     For full refund of all purchase costs Plaintiff paid for Defendants' FLQ drugs;

(k)     For compensatory damages in excess of the jurisdictional minimum of this Court;

(l)     For consequential damages in excess of the jurisdictional minimum of this Court;

(m)     For punitive damages in an amount in excess of any jurisdictional minimum of this Court and in an amount sufficient to impress upon Defendants the seriousness of their conduct and to deter similar conduct in the future;

(n)     For attorneys' fees, expenses, and costs of this action; and

(o)     For such further relief as this Court deems necessary, just, and proper.

**WHEREFORE**, Plaintiff Jennifer Akman demands judgment against Defendants in an amount to be determined at trial but believed to be in excess of one hundred thousand dollars ($100,000.00) in damages, plus costs of this suit, and such other and further relief as this Court deems just and proper.

Dated: November 14, 2016

Respectfully submitted,

PAULSON & NACE, PLLC

/s/ *Christopher T. Nace*
Christopher T. Nace, Bar No. 977865
1615 New Hampshire Ave., NW
Washington, DC 20009
202-463-1999 – Telephone
202-223-6824 – Facsimile
ctnace@paulsonandnace.com

Christopher Nidel, Bar No. 497059
Nidel & Nace, PLLL
5335 Wisconsin Ave., NW
Suite 440
Washington, DC 20015
202-478-9677
chris@nidellaw.com

*Counsel for Plaintiff*

## Jury Demand

Plaintiff, by and through the undersigned counsel and pursuant to Rule 38 of the District of Columbia Rules of Civil Procedure, hereby demands trial by jury of all issues in this matter.

*/s/ Christopher T. Nace*
Christopher T. Nace

# Superior Court of the District of Columbia

CIVIL DIVISION- CIVIL ACTIONS BRANCH

INFORMATION SHEET

JENNIFER AKMAN

Case Number: __2016 CA 008298 B__

vs

Date: __11/14/2016__

BAYER HEALTHCARE PHARMACEUTICALS, INC., et al.

☐ One of the defendants is being sued
in their official capacity.

| | |
|---|---|
| Name: *(Please Print)*<br>Christopher T. Nace | Relationship to Lawsuit |
| Firm Name:<br>Paulson & Nace, PLLC | ☒ Attorney for Plaintiff |
| Telephone No.:                Six digit Unified Bar No.:<br>202-463-1999                977865 | ☐ Self (Pro Se)<br>☐ Other: _____ |

TYPE OF CASE: ☒ Non-Jury     ☐ 6 Person Jury     ☐ 12 Person Jury
Demand: $ In Excess of $100,000.00 _____     Other: _____

PENDING CASE(S) RELATED TO THE ACTION BEING FILED

Case No.:_____     Judge: _____     Calendar #:_____

Case No.:_____     Judge: _____     Calendar#:_____

---

NATURE OF SUIT:     *(Check One Box Only)*

### A. CONTRACTS

COLLECTION CASES

☐ 01 Breach of Contract
☐ 02 Breach of Warranty
☐ 06 Negotiable Instrument
☐ 15 Special Education Fees

☐ 07 Personal Property
☐ 09 Real Property-Real Estate
☐ 12 Specific Performance
☐ 13 Employment Discrimination

☐ 14 Under $25,000 Pltf. Grants Consent
☐ 16 Under $25,000 Consent Denied
☐ 17 OVER $25,000

### B. PROPERTY TORTS

☐ 01 Automobile
☐ 02 Conversion
☐ 07 Shoplifting, D.C. Code § 27-102 (a)

☐ 03 Destruction of Private Property
☐ 04 Property Damage

☐ 05 Trespass
☐ 06 Traffic Adjudication

### C. PERSONAL TORTS

☐ 01 Abuse of Process
☐ 02 Alienation of Affection
☐ 03 Assault and Battery
☐ 04 Automobile- Personal Injury
☐ 05 Deceit (Misrepresentation)
☐ 06 False Accusation
☐ 07 False Arrest
☐ 08 Fraud

☐ 09 Harassment
☐ 10 Invasion of Privacy
☐ 11 Libel and Slander
☐ 12 Malicious Interference
☐ 13 Malicious Prosecution
☐ 14 Malpractice Legal
☐ 15 Malpractice Medical (Including Wrongful Death)
☐ 16 Negligence- (Not Automobile,
       Not Malpractice)

☐ 17 Personal Injury- (Not Automobile,
       Not Malpractice)
☐ 18 Wrongful Death (Not Malpractice)
☐ 19 Wrongful Eviction
☐ 20 Friendly Suit
☐ 21 Asbestos
☐ 22 Toxic/Mass Torts
☐ 23 Tobacco
☐ 24 Lead Paint

SEE REVERSE SIDE AND CHECK HERE ☒   IF USED

CV-496/Aug 12

# Information Sheet, Continued

**C. OTHERS**

I.
- ☐ 01 Accounting
- ☐ 02 Att. Before Judgment
- ☐ 04 Condemnation (Emin. Domain)
- ☐ 05 Ejectment
- ☐ 07 Insurance/Subrogation
     Under $25,000 Pltf.
     Grants Consent
- ☐ 08 Quiet Title
- ☐ 09 Special Writ/Warrants
     (DC Code § 11-941)

- ☐ 10 T.R.O./ Injunction
- ☐ 11 Writ of Replevin
- ☐ 12 Enforce Mechanics Lien
- ☐ 16 Declaratory Judgment
- ☐ 17 Merit Personnel Act (OEA)
     (D.C. Code Title 1, Chapter 6)
- ☒ 18 Product Liability
- ☐ 24 Application to Confirm, Modify,
     Vacate Arbitration Award
     (DC Code § 16-4401)

- ☐ 25 Liens: Tax/Water Consent Granted
- ☐ 26 Insurance/ Subrogation
     Under $25,000 Consent Denied
- ☐ 27 Insurance/ Subrogation
     Over $25,000
- ☐ 28 Motion to Confirm Arbitration
     Award (Collection Cases Only)
- ☐ 26 Merit Personnel Act (OHR)
- ☐ 30 Liens: Tax/ Water Consent Denied
- ☐ 31 Housing Code Regulations

II.
- ☐ 03 Change of Name
- ☐ 06 Foreign Judgment
- ☐ 13 Correction of Birth Certificate
- ☐ 14 Correction of Marriage
     Certificate

- ☐ 15 Libel of Information
- ☐ 19 Enter Administrative Order as
     Judgment [ D.C. Code §
     2-1802.03 (h) or 32-1519 (a)]
- ☐ 20 Master Meter (D.C. Code §
     42-3301, et seq.)

- ☐ 21 Petition for Subpoena
     [Rule 28-I (b)]
- ☐ 22 Release Mechanics Lien
- ☐ 23 Rule 27(a) (1)
     (Perpetuate Testimony)
- ☐ 24 Petition for Structured Settlement
- ☐ 25 Petition for Liquidation

/s/ Christopher T. Nace

Attorney's Signature

November 14, 2016

Date

CV-496/Aug 12



**Superior Court of the District of Columbia**
**CIVIL DIVISION**
500 Indiana Avenue, N.W., Suite 5000
Washington, D.C. 20001 Telephone: (202) 879-1133

## JENNIFER AKMAN

_____
Plaintiff

vs.                                                 Case Number  **2016 CA 008298 B**

BAYER HEALTHCARE PHARMACEUTICALS, INC.
_____
Defendant

Serve: 100 Bayer Blvd.

Whippany, NJ 07981            **SUMMONS**

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty (20) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the party plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within five (5) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Christopher T. Nace
_____
Name of Plaintiff's Attorney

1615 New Hampshire Ave., NW
_____
Address

Washington, DC 20009
_____

202-463-1999
_____
Telephone

_____
Clerk of the Court

By _____
Deputy Clerk

Date  **11/15/2016**

如需翻譯,請打电话 (202) 879-4828     Veuillez appeler au (202) 879-4828 pour une traduction     Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202) 879-4828 로 전화주십시요      የአማርኛ ተርጓሚ ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español





**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
**DIVISIÓN CIVIL**
500 Indiana Avenue, N.W., Suite 5000
Washington, D.C. 20001 Teléfono: (202) 879-1133

_____

_____ Demandante

contra

Número de Caso: _____

_____

_____ Demandado

### CITATORIO

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veinte (20) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que Usted le entregue al demandante una copia de la Contestación o en el plazo de cinco (5) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

*SECRETARIO DEL TRIBUNAL*

Nombre del abogado del Demandante
_____

Por: _____

Dirección
_____
Subsecretario

Fecha _____

Teléfono
_____

如需翻譯译,请打电话 (202) 879-4828     Veuillez appeler au (202) 879-4828 pour une traduction     Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828 로 전화주십시오     ኢትዮጵያ ተርጓሚ ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO, O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍAN RETENERLE SUS INGRESOS, O PODRÍAN TOMAR SUS BIENES PERSONALES O RAÍCES Y VENDERLOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, *NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO.*

Si desea conversar con un abogado y le parece que no puede afrontar el costo de uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse de otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

CASUM.doc



**Superior Court of the District of Columbia**
CIVIL DIVISION
500 Indiana Avenue, N.W., Suite 5000
Washington, D.C. 20001 Telephone: (202) 879-1133

JENNIFER AKMAN
_____
                                      Plaintiff

                        vs.                              Case Number   2016 CA 008298 B

BAYER CORPORATION
_____
                                      Defendant

Serve: 100 Bayer Road

Pittsburgh, PA 15205              **SUMMONS**
To the above named Defendant:

        You are hereby summoned and required to serve an Answer to the attached Complaint, either
personally or through an attorney, within twenty (20) days after service of this summons upon you, exclusive
of the day of service. If you are being sued as an officer or agency of the United States Government or the
District of Columbia Government, you have sixty (60) days after service of this summons to serve your
Answer. A copy of the Answer must be mailed to the attorney for the party plaintiff who is suing you. The
attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed
to the plaintiff at the address stated on this Summons.

        You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue,
N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on
Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on
the plaintiff or within five (5) days after you have served the plaintiff. If you fail to file an Answer, judgment
by default may be entered against you for the relief demanded in the complaint.

Christopher T. Nace
_____          Clerk of the Court
Name of Plaintiff's Attorney

1615 New Hampshire Ave., NW
_____          By _____
Address                                                        Deputy Clerk
Washington, DC 20009

202-463-1999
_____          Date   **11/15/2016**
Telephone
如需翻译,请打电话 (202) 879-4828      Veuillez appeler au (202) 879-4828 pour une traduction      Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202) 879-4828 로 전화주십시오      የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ።

        IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU
ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT
MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE
COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR
REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS
ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

        If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the
Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500
Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

                        See reverse side for Spanish translation
                        Vea al dorso la traducción al español

FORM SUMMONS - Jan. 2011                                              CASUM.doc





**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
**DIVISIÓN CIVIL**
500 Indiana Avenue, N.W., Suite 5000
Washington, D.C. 20001 Teléfono: (202) 879-1133

_____
                                    Demandante

contra

_____          Número de Caso: _____
                                    Demandado

## CITATORIO

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le requiere entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veinte (20) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le requiere presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que Usted le entregue al demandante una copia de la Contestación o en el plazo de cinco (5) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

_____          *SECRETARIO DEL TRIBUNAL*
Nombre del abogado del Demandante

                                    Por _____
_____
Dirección                                          Subsecretario

                                    Fecha _____
_____
Teléfono
如需翻译, 请打电话 (202) 879-4828      Veuillez appeler au (202) 879-4828 pour une traduction      Để có một bài dịch, hãy gọi (202) 879-4828
          번역을 원하시면, (202) 879-4828 로 전화주십시요.          ያማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO, O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍAN RETENERLE SUS INGRESOS, O PODRÍAN TOMAR SUS BIENES PERSONALES O RAÍCES Y VENDERLOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, _NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO_.

Si desea conversar con un abogado y le parece que no puede afrontar el costo de uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse de otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

CASUM.doc



**Superior Court of the District of Columbia**
**CIVIL DIVISION**
500 Indiana Avenue, N.W., Suite 5000
Washington, D.C. 20001 Telephone: (202) 879-1133

JENNIFER AKMAN

_____
                                    Plaintiff

vs.                                                     Case Number  **2016 CA 008298 B**

COBALT LABORATORIES, INC. AKA COBALT LABORATORIES LLC
_____
                                    Defendant
24840 S Tamiami Trl, Ste. 1

Bonita Springs, FL 34134-7009                **SUMMONS**
To the above named Defendant:

        You are hereby summoned and required to serve an Answer to the attached Complaint, either
personally or through an attorney, within twenty (20) days after service of this summons upon you, exclusive
of the day of service. If you are being sued as an officer or agency of the United States Government or the
District of Columbia Government, you have sixty (60) days after service of this summons to serve your
Answer. A copy of the Answer must be mailed to the attorney for the party plaintiff who is suing you. The
attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed
to the plaintiff at the address stated on this Summons.

        You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue,
N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on
Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on
the plaintiff or within five (5) days after you have served the plaintiff. If you fail to file an Answer, judgment
by default may be entered against you for the relief demanded in the complaint.

Christopher T. Nace                                _____
_____           Clerk of the Court
Name of Plaintiff's Attorney

1615 New Hampshire Ave., NW                 By _____
_____                        Deputy Clerk
Address
Washington, DC 20009

202-463-1999                                       Date    **11/15/2016**
_____
Telephone
如需翻译，请打电话 (202) 879-4828      Veuillez appeler au (202) 879-4828 pour une traduction      Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202) 879-4828 로 전화주십시요.      የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

        IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU
ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT
MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE
COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR
REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS
ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

        If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the
Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500
Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

                                  See reverse side for Spanish translation
                                  Vea al dorso la traducción al español

FORM SUMMONS - Jan. 2011                                                                CASUM.doc





**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
**DIVISIÓN CIVIL**
500 Indiana Avenue, N.W., Suite 5000
Washington, D.C. 20001 Teléfono: (202) 879-1133

_____ Demandante

contra

_____ Número de Caso: _____

_____ Demandado

## CITATORIO

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veinte (20) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que Usted le entregue al demandante una copia de la Contestación o en el plazo de cinco (5) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

_SECRETARIO DEL TRIBUNAL_

_____
Nombre del abogado del Demandante

Por: _____

_____
Dirección                                    Subsecretario

_____
Fecha _____

_____
Teléfono

如需翻译, 请打电话 (202) 879-4828      Veuillez appeler au (202) 879-4828 pour une traduction      Để có một bản dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828 로 전화주십시오      ያማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO, O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍAN RETENERLE SUS INGRESOS, O PODRÍAN TOMAR SUS BIENES PERSONALES O RAÍCES Y VENDERLOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, _NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO._

Si desea conversar con un abogado y le parece que no puede afrontar el costo de uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue. N.W., para informarse de otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

CASUM.doc



**Superior Court of the District of Columbia**
CIVIL DIVISION
500 Indiana Avenue, N.W., Suite 5000
Washington, D.C. 20001 Telephone: (202) 879-1133

JENNIFER AKMAN

_____
                    Plaintiff

vs.                                          Case Number   **2016 CA 008298 B**
                                                          _____

ACTAVIS PHARMA COMPANY
_____
                    Defendant

6733 Mississauga Road, Suite 400

Mississauga, ON L5N 6J5 Canada          **SUMMONS**
To the above named Defendant:

        You are hereby summoned and required to serve an Answer to the attached Complaint, either
personally or through an attorney, within twenty (20) days after service of this summons upon you, exclusive
of the day of service. If you are being sued as an officer or agency of the United States Government or the
District of Columbia Government, you have sixty (60) days after service of this summons to serve your
Answer. A copy of the Answer must be mailed to the attorney for the party plaintiff who is suing you. The
attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed
to the plaintiff at the address stated on this Summons.

        You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue,
N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on
Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on
the plaintiff or within five (5) days after you have served the plaintiff. If you fail to file an Answer, judgment
by default may be entered against you for the relief demanded in the complaint.

Christopher T. Nace                              _Clerk of the Court_
_____
Name of Plaintiff's Attorney

1615 New Hampshire Ave., NW           By _____
_____                    Deputy Clerk
Address
Washington, DC 20009

202—463—1999                          Date        **11/15/2016**
_____          _____
Telephone
如需翻译, 请打电话 (202) 879-4828     Veuillez appeler au (202) 879-4828 pour une traduction     Để có một bản dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202) 879-4828 로 전화주십시요     የአማርኛ ትርጉም ከፈለጉ በ (202) 879-4828 ይደውሉ

        IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU
ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT
MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE
COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR
REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS
ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

        If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the
Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500
Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

                          See reverse side for Spanish translation
                          Vea al dorso la traducción al español

FORM SUMMONS - Jan. 2011                                                    CASUM.doc





# TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA
## DIVISIÓN CIVIL
### 500 Indiana Avenue, N.W., Suite 5000
### Washington, D.C. 20001 Teléfono: (202) 879-1133

_____
                        Demandante

        contra

                                                Número de Caso: _____

_____
                        Demandado

## CITATORIO

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veinte (20) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que Usted le entregue al demandante una copia de la Contestación o en el plazo de cinco (5) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

                                        _SECRETARIO DEL TRIBUNAL_

_____
Nombre del abogado del Demandante

                                        Por: _____

_____
Dirección                                                        Subsecretario

                                        Fecha: _____

_____
Teléfono
如需翻译,请打电话 (202) 879-4828      Veuillez appeler au (202) 879-4828 pour une traduction      Để có một bài dịch, hãy gọi (202) 879-4828
        번역을 원하시면, (202) 879-4828 로 전화주십시요         የトルコ语 ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO, O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍAN RETENERLE SUS INGRESOS, O PODRÍAN TOMAR SUS BIENES PERSONALES O RAÍCES Y VENDERLOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, _NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO._

Si desea conversar con un abogado y le parece que no puede afrontar el costo de uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse de otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

                                                        CASUM.doc



### SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### CIVIL DIVISION

JENNIFER AKMAN et al
    Vs.                                         C.A. No.      2016 CA 008298 B
BAYER HEALTHCARE PHARMACEUTICALS, INC. et al

### INITIAL ORDER AND ADDENDUM

Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("SCR Civ") 40-I, it is hereby **ORDERED** as follows:

(1) Effective this date, this case has assigned to the individual calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption. On filing any motion or paper related thereto, one copy (for the judge) must be delivered to the Clerk along with the original.

(2) Within 60 days of the filing of the complaint, plaintiff must file proof of serving on each defendant: copies of the Summons, the Complaint, and this Initial Order. As to any defendant for whom such proof of service has not been filed, the Complaint will be dismissed without prejudice for want of prosecution unless the time for serving the defendant has been extended as provided in SCR Civ 4(m).

(3) Within 20 days of service as described above, except as otherwise noted in SCR Civ 12, each defendant must respond to the Complaint by filing an Answer or other responsive pleading. As to the defendant who has failed to respond, a default and judgment will be entered unless the time to respond has been extended as provided in SCR Civ 55(a).

(4) At the time and place noted below, all counsel and unrepresented parties shall appear before the assigned judge at an Initial Scheduling and Settlement Conference to discuss the possibilities of settlement and to establish a schedule for the completion of all proceedings, including, normally, either mediation, case evaluation, or arbitration. Counsel shall discuss with their clients **prior** to the conference whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this Conference.**

(5) Upon advice that the date noted below is inconvenient for any party or counsel, the Quality Review Branch (202) 879-1750 may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. Request must be made not less than six business days before the scheduling conference date. No other continuance of the conference will be granted except upon motion for good cause shown.

(6) Parties are responsible for obtaining and complying with all requirements of the General Order for Civil cases, each Judge's Supplement to the General Order and the General Mediation Order. Copies of these orders are available in the Courtroom and on the Court's website http://www.dccourts.gov/.

Chief Judge Robert E. Morin

Case Assigned to: Judge BRIAN F HOLEMAN
Date:  November 15, 2016
Initial Conference: 9:30 am, Friday, February 17, 2017
Location:  Courtroom 214
          500 Indiana Avenue N.W.

Caio.doc

## ADDENDUM TO INITIAL ORDER AFFECTING
## ALL MEDICAL MALPRACTICE CASES

In accordance with the Medical Malpractice Proceedings Act of 2006, D.C. Code § 16-2801, et seq. (2007 Winter Supp.), "[a]fter an action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery or, if all parties agree[,] with only limited discovery that will not interfere with the completion of mediation within 30 days of the Initial Scheduling and Settlement Conference ("ISSC"), prior to any further litigation in an effort to reach a settlement agreement.  The early mediation schedule shall be included in the Scheduling Order following the ISSC.  Unless all parties agree, the stay of discovery shall not be more than 30 days after the ISSC." D.C. Code § 16-2821.

To ensure compliance with this legislation, on or before the date of the ISSC, the Court will notify all attorneys and *pro se* parties of the date and time of the early mediation session and the name of the assigned mediator.  Information about the early mediation date also is available over the internet at https://www.dccourts.gov/pa/.  To facilitate this process, all counsel and *pro se* parties in every medical malpractice case are required to confer, jointly complete and sign an EARLY MEDIATION FORM, which must be filed no later than ten (10) calendar days prior to the ISSC.  Two separate Early Mediation Forms are available.  Both forms may be obtained at www.dccourts.gov/medmalmediation.  One form is to be used for early mediation with a mediator from the multi-door medical malpractice mediator roster; the second form is to be used for early mediation with a private mediator.  Both forms also are available in the Multi-Door Dispute Resolution Office, Suite 2900, 410 E Street, N.W.  Plaintiff's counsel is responsible for eFiling the form and is required to e-mail a courtesy copy to earlymedmal@dcsc.gov.  *Pro se* Plaintiffs who elect not to eFile may file by hand in the Multi-Door Dispute Resolution Office.

A roster of medical malpractice mediators available through the Court's Multi-Door Dispute Resolution Division, with biographical information about each mediator, can be found at www.dccourts.gov/medmalmediation/mediatorprofiles.  All individuals on the roster are judges or lawyers with at least 10 years of significant experience in medical malpractice litigation. D.C. Code § 16-2823(a).  If the parties cannot agree on a mediator, the Court will appoint one. D.C. Code § 16-2823(b).

The following persons are required by statute to attend personally the Early Mediation Conference: (1) all parties; (2) for parties that are not individuals, a representative with settlement authority; (3) in cases involving an insurance company, a representative of the company with settlement authority; and (4) attorneys representing each party with primary responsibility for the case.  D.C. Code § 16-2824.

No later than ten (10) days after the early mediation session has terminated, Plaintiff must eFile with the Court a report prepared by the mediator, including a private mediator, regarding: (1) attendance; (2) whether a settlement was reached; or, (3) if a settlement was not reached, any agreements to narrow the scope of the dispute, limit discovery, facilitate future settlement, hold another mediation session, or otherwise reduce the cost and time of trial preparation. D.C. Code§ 16-2826.  Any Plaintiff who is *pro se* may elect to file the report by hand with the Civil Clerk's Office.    The forms to be used for early mediation reports are available at www.dccourts.gov/medmalmediation.

Chief   Judge   Robert   E.   Morin

Caio.doc



# SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

JENNIFER AKMAN et al
Vs.                                                      C.A. No.       2016 CA 008298 B
BAYER HEALTHCARE PHARMACEUTICALS, INC. et al

## INITIAL ORDER AND ADDENDUM

Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("SCR Civ") 40-I, it is hereby **ORDERED** as follows:

(1) Effective this date, this case has assigned to the individual calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption. On filing any motion or paper related thereto, one copy (for the judge) must be delivered to the Clerk along with the original.

(2) Within 60 days of the filing of the complaint, plaintiff must file proof of serving on each defendant: copies of the Summons, the Complaint, and this Initial Order. As to any defendant for whom such proof of service has not been filed, the Complaint will be dismissed without prejudice for want of prosecution unless the time for serving the defendant has been extended as provided in SCR Civ 4(m).

(3) Within 20 days of service as described above, except as otherwise noted in SCR Civ 12, each defendant must respond to the Complaint by filing an Answer or other responsive pleading. As to the defendant who has failed to respond, a default and judgment will be entered unless the time to respond has been extended as provided in SCR Civ 55(a).

(4) At the time and place noted below, all counsel and unrepresented parties shall appear before the assigned judge at an Initial Scheduling and Settlement Conference to discuss the possibilities of settlement and to establish a schedule for the completion of all proceedings, including, normally, either mediation, case evaluation, or arbitration. Counsel shall discuss with their clients **prior** to the conference whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this Conference.**

(5) Upon advice that the date noted below is inconvenient for any party or counsel, the Quality Review Branch (202) 879-1750 may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. Request must be made not less than six business days before the scheduling conference date. No other continuance of the conference will be granted except upon motion for good cause shown.

(6) Parties are responsible for obtaining and complying with all requirements of the General Order for Civil cases, each Judge's Supplement to the General Order and the General Mediation Order. Copies of these orders are available in the Courtroom and on the Court's website http://www.dccourts.gov/.

Chief Judge Robert E. Morin

Case Assigned to: Judge BRIAN F HOLEMAN
Date:  November 15, 2016
Initial Conference: 9:30 am, Friday, February 17, 2017
Location:  Courtroom 214
         500 Indiana Avenue N.W.

Caio.doc

## ADDENDUM TO INITIAL ORDER AFFECTING
## ALL MEDICAL MALPRACTICE CASES

In accordance with the Medical Malpractice Proceedings Act of 2006, D.C. Code § 16-2801, et seq. (2007 Winter Supp.), "[a]fter an action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery or, if all parties agree[,] with only limited discovery that will not interfere with the completion of mediation within 30 days of the Initial Scheduling and Settlement Conference ("ISSC"), prior to any further litigation in an effort to reach a settlement agreement.  The early mediation schedule shall be included in the Scheduling Order following the ISSC.  Unless all parties agree, the stay of discovery shall not be more than 30 days after the ISSC."  D.C. Code § 16-2821.

To ensure compliance with this legislation, on or before the date of the ISSC, the Court will notify all attorneys and *pro se* parties of the date and time of the early mediation session and the name of the assigned mediator.  Information about the early mediation date also is available over the internet at https://www.dccourts.gov/pa/.  To facilitate this process, all counsel and *pro se* parties in every medical malpractice case are required to confer, jointly complete and sign an EARLY MEDIATION FORM, which must be filed no later than ten (10) calendar days prior to the ISSC.  Two separate Early Mediation Forms are available.  Both forms may be obtained at www.dccourts.gov/medmalmediation.  One form is to be used for early mediation with a mediator from the multi-door medical malpractice mediator roster; the second form is to be used for early mediation with a private mediator.  Both forms also are available in the Multi-Door Dispute Resolution Office, Suite 2900, 410 E Street, N.W.  Plaintiff's counsel is responsible for eFiling the form and is required to e-mail a courtesy copy to earlymedmal@dcsc.gov.  *Pro se* Plaintiffs who elect not to eFile may file by hand in the Multi-Door Dispute Resolution Office.

A roster of medical malpractice mediators available through the Court's Multi-Door Dispute Resolution Division, with biographical information about each mediator, can be found at www.dccourts.gov/medmalmediation/mediatorprofiles.  All individuals on the roster are judges or lawyers with at least 10 years of significant experience in medical malpractice litigation.  D.C. Code § 16-2823(a).  If the parties cannot agree on a mediator, the Court will appoint one.  D.C. Code § 16-2823(b).

The following persons are required by statute to attend personally the Early Mediation Conference: (1) all parties; (2) for parties that are not individuals, a representative with settlement authority; (3) in cases involving an insurance company, a representative of the company with settlement authority; and (4) attorneys representing each party with primary responsibility for the case.  D.C. Code § 16-2824.

No later than ten (10) days after the early mediation session has terminated, Plaintiff must eFile with the Court a report prepared by the mediator, including a private mediator, regarding: (1) attendance; (2) whether a settlement was reached; or, (3) if a settlement was not reached, any agreements to narrow the scope of the dispute, limit discovery, facilitate future settlement, hold another mediation session, or otherwise reduce the cost and time of trial preparation.  D.C. Code§ 16-2826. Any Plaintiff who is *pro se* may elect to file the report by hand with the Civil Clerk's Office.   The forms to be used for early mediation reports are available at www.dccourts.gov/medmalmediation.

Chief     Judge     Robert     E.     Morin

Caio.doc

 

### SUPERIOR COURT OF THE DISTRICT OF COLUMBIA - CIVIL DIVISION

FILED
CIVIL ACTIONS BRANCH

DEC 3 0 2016 *ayh*

Superior Court
of the District of Columbia
Washington, D.C.

Jennifer Akman

**Plaintiff**

*vs.*

Case No: 2016 CA 008298 B

Bayer Healthcare Pharmaceuticals, Inc., et al.

**Defendant**

### AFFIDAVIT OF SERVICE

I, David J. Murgittroyd, a Private Process Server, being duly sworn, depose and say:

That I have been duly authorized to make service of the Summons, Information Sheet, and Complaint in the above entitled case.

That I am over the age of eighteen years and not a party to or otherwise interested in this action.

That on 12/27/2016 at 3:20 PM, I served Bayer Healthcare Pharmaceuticals, Inc. with the Summons, Information Sheet, and Complaint at 100 Bayer Boulevard, Whippany, New Jersey 07981 by serving Brad Fiorendo, Esquire, authorized to accept service.

Brad Fiorendo is described herein as:

Gender: Male   Race/Skin: White   Age: 37   Weight: 210   Height: 6'2"   Hair: Red   Glasses: Yes

I do solemnly declare and affirm under penalty of perjury that I have read the foregoing information set forth herein is correct to the best of my knowledge, information, and belief.

Sworn to before me on
*Dec. 28, 2016*

Notary Public
My Commission Expires:

ROBERT CIFELLI
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires 10/6/2018

David J. Murgittroyd   12/28/16

Client Ref Number:N/A
Job #: 1519695

Capitol Process Services, Inc. | 1827 18th Street, NW, Washington, DC 20009 | (202) 667-0050

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA - CIVIL DIVISION

FILED
CIVIL ACTIONS BRANCH

DEC 30 2016 *aja*

Superior Court
of the District of Columbia
Washington, D.C.

**Jennifer Akman**

**Plaintiff**

*vs.*   Case No: 2016 CA 008298 B

**Bayer Healthcare Pharmaceuticals, Inc., et al.**

**Defendant**

### AFFIDAVIT OF SERVICE

I, Kenneth J. Kearney, a Private Process Server, being duly sworn, depose and say:

That I have been duly authorized to make service of the Summons, Information Sheet, and Complaint in the above entitled case.

That I am over the age of eighteen years and not a party to or otherwise interested in this action.

That on 12/24/2016 at 9:50 AM, I served Bayer Corporation with the Summons, Information Sheet, and Complaint at 100 Bayer Road, Pittsburgh, Pennsylvania 15205 by serving Kayla Dingman, Legal Assistant, authorized to accept service.

Kayla Dingman is described herein as:

Gender: Female   Race/Skin: White   Age: 30-35   Weight: 130   Height: 5'1"   Hair: Blonde   Glasses: No

I do solemnly declare and affirm under penalty of perjury that I have read the foregoing information set forth herein is correct to the best of my knowledge, information, and belief.

Sworn to before me on   12-27-16

_____
Notary Public
My Commission Expires: 12 July 2020

_____
Kenneth J. Kearney

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Dana M. Pcolar, Notary Public
Penn Twp., Westmoreland County
My Commission Expires July 12, 2020
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

Capital Process Services, Inc. | 1827 18th Street, NW, Washington, DC 20009 | (202) 667-0050

Client Ref Number:N/A
Job #: 1519696

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA - CIVIL DIVISION



Jennifer Akman

**Plaintiff**

JAN 1 1 2017

Superior Court of the
District of Columbia
Washington, D.C.

*vs.*

Case No: 2016 CA 008298 B

Bayer Healthcare Pharmaceuticals, Inc., et al.

**Defendant**

## AFFIDAVIT OF SERVICE

I, Peter Hunt, a Private Process Server, being duly sworn, depose and say:

That I have been duly authorized to make service of the Summons, Information Sheet, and Complaint in the above entitled case.

That I am over the age of eighteen years and not a party to or otherwise interested in this action.

That on 01/03/2017 at 2:15 PM, I served Actavis Pharma Company with the Summons, Information Sheet, and Complaint at 6733 Mississauga Road, Suite 400, Mississauga, Ontario L5N 6J5 by serving Chris Ichiyen, Director of Finance, authorized to accept service.

Chris Ichiyen is described herein as:

Gender: Male   Race/Skin: White   Age: 40-45   Weight: 140-165   Height: 5'10"-5'11"   Hair: Brown   Glasses: No

I do solemnly declare and affirm under penalty of perjury that I have read the foregoing information set forth herein is correct to the best of my knowledge, information, and belief.

Sworn to before me on

JANUARY 9, 2017

Peter Hunt

Notary Public
My Commission Expires:

Client Ref Number:N/A
Job #: 1519698

Capitol Process Services, Inc. | 1827 18th Street, NW, Washington, DC 20009 | (202) 667-0050

# Superior Court of the District of Columbia

CIVIL DIVISION- CIVIL ACTIONS BRANCH

INFORMATION SHEET

JENNIFER AKMAN

Case Number: **2016 CA 008298 B**

vs

Date: 11/14/2016

BAYER HEALTHCARE PHARMACEUTICALS, INC., et al.

☐ One of the defendants is being sued in their official capacity.

| Name: *(Please Print)* Christopher T. Nace | Relationship to Lawsuit |
| Firm Name: Paulson & Nace, PLLC | ☒ Attorney for Plaintiff |
| | ☐ Self (Pro Se) |
| Telephone No.:  Six digit Unified Bar No.: 202-463-1999           977865 | ☐ Other: _____ |

TYPE OF CASE:  ☒ Non-Jury      ☐ 6 Person Jury      ☐ 12 Person Jury

Demand: $ In Excess of $100,000.00      Other: _____

PENDING CASE(S) RELATED TO THE ACTION BEING FILED

Case No.:_____   Judge: _____   Calendar #:_____

Case No.:_____   Judge: _____   Calendar#:_____

---

**NATURE OF SUIT:**      *(Check One Box Only)*

**A. CONTRACTS**                                                    **COLLECTION CASES**

☐ 01 Breach of Contract          ☐ 07 Personal Property          ☐ 14 Under $25,000 Pltf. Grants Consent
☐ 02 Breach of Warranty          ☐ 09 Real Property-Real Estate   ☐ 16 Under $25,000 Consent Denied
☐ 06 Negotiable Instrument       ☐ 12 Specific Performance        ☐ 17 OVER $25,000
☐ 15 Special Education Fees       ☐ 13 Employment Discrimination

---

**B. PROPERTY TORTS**

☐ 01 Automobile                  ☐ 03 Destruction of Private Property   ☐ 05 Trespass
☐ 02 Conversion                  ☐ 04 Property Damage                   ☐ 06 Traffic Adjudication
☐ 07 Shoplifting, D.C. Code § 27-102 (a)

---

**C. PERSONAL TORTS**

☐ 01 Abuse of Process            ☐ 09 Harassment                  ☐ 17 Personal Injury- (Not Automobile,
☐ 02 Alienation of Affection     ☐ 10 Invasion of Privacy              Not Malpractice)
☐ 03 Assault and Battery         ☐ 11 Libel and Slander           ☐ 18 Wrongful Death (Not Malpractice)
☐ 04 Automobile- Personal Injury ☐ 12 Malicious Interference      ☐ 19 Wrongful Eviction
☐ 05 Deceit (Misrepresentation)  ☐ 13 Malicious Prosecution       ☐ 20 Friendly Suit
☐ 06 False Accusation            ☐ 14 Malpractice Legal           ☐ 21 Asbestos
☐ 07 False Arrest                ☐ 15 Malpractice Medical (Including Wrongful Death)  ☐ 22 Toxic/Mass Torts
☐ 08 Fraud                       ☐ 16 Negligence- (Not Automobile, ☐ 23 Tobacco
                                      Not Malpractice)             ☐ 24 Lead Paint

---

SEE REVERSE SIDE AND CHECK HERE  ☒  IF USED

CV-496/Aug 12

# Information Sheet, Continued

**C. OTHERS**

I.

| | | |
|---|---|---|
| ☐ 01 Accounting | ☐ 10 T.R.O./ Injunction | ☐ 25 Liens: Tax/Water Consent Granted |
| ☐ 02 Att. Before Judgment | ☐ 11 Writ of Replevin | ☐ 26 Insurance/Subrogation |
| ☐ 04 Condemnation (Emin. Domain) | ☐ 12 Enforce Mechanics Lien | Under $25,000 Consent Denied |
| ☐ 05 Ejectment | ☐ 16 Declaratory Judgment | ☐ 27 Insurance/ Subrogation |
| ☐ 07 Insurance/Subrogation | ☐ 17 Merit Personnel Act (OEA) | Over $25,000 |
| Under $25,000 Pltf. | (D.C. Code Title 1, Chapter 6) | ☐ 28 Motion to Confirm Arbitration |
| Grants Consent | ☒ 18 Product Liability | Award (Collection Cases Only) |
| ☐ 08 Quiet Title | ☐ 24 Application to Confirm, Modify, | ☐ 26 Merit Personnel Act (OHR) |
| ☐ 09 Special Writ/Warrants | Vacate Arbitration Award | ☐ 30 Liens: Tax/ Water Consent Denied |
| (DC Code § 11-941) | (DC Code § 16-4401) | ☐ 31 Housing Code Regulations |

II.

| | | |
|---|---|---|
| ☐ 03 Change of Name | ☐ 15 Libel of Information | ☐ 21 Petition for Subpoena |
| ☐ 06 Foreign Judgment | ☐ 19 Enter Administrative Order as | [Rule 28-I (b)] |
| ☐ 13 Correction of Birth Certificate | Judgment [ D.C. Code § | ☐ 22 Release Mechanics Lien |
| ☐ 14 Correction of Marriage | 2-1802.03 (h) or 32-1519 (a)] | ☐ 23 Rule 27(a) (1) |
| Certificate | ☐ 20 Master Meter (D.C. Code § | (Perpetuate Testimony) |
| | 42-3301, et seq.) | ☐ 24 Petition for Structured Settlement |
| | | ☐ 25 Petition for Liquidation |

/s/ Christopher T. Nace

Attorney's Signature

November 14, 2016

Date

AKMAN, JENNIFER, et al. vs. BAYER HEALTHCARE PHARMACEUTICALS, INC., et al., Docket No. 2016-CA-008298 (D.C.

Current on Bloomberg Law as of Jan 11, 2017 16:16:29

## District of Columbia Superior Court
## Docket for Case #: 2016 CA 008298 B

# AKMAN, JENNIFER, et al. vs. BAYER HEALTHCARE PHARMACEUTICALS, INC., et al.

| | |
|---|---|
| Date Filed: | Nov 14, 2016 |
| Status: | Open |
| Case Type: | Civil II |
| Disposition: | Undisposed |

## Parties and Attorneys

**Plaintiff**                                              **Attorneys and Firms**

AKMAN, JENNIFER                                NACE, CHRISTOPHER T.

**Plaintiff**

NIDEL, CHRISTOPHER

**Defendant**

BAYER HEALTHCARE PHARMACEUTICALS, INC.

**Defendant**

BAYER CORPORATION

**Defendant**

COBALT LABORATORIES, INC.
Alias: COBALT LABORATORIES, LLC

**Defendant**

ACTAVIS PHARMA COMPANY

## Calendar

| Date | Time | Location | Description | Judge |
|---|---|---|---|---|
| Feb 17, 2017 | 09:30:00 | Courtroom 214 | Initial Scheduling Conference-60 | HOLEMAN, BRIAN F |

## Docket Entries                                                    Reverse Entries

| BL Item # | Filing Date | Action | Description |
|---|---|---|---|
| | | | MANUALLY-COLLECTED COMPLAINT |
| BL-1 | Nov 14, 2016 | Request | Complaint for Product Liability Filed Receipt: 353347 Date: 11/15/2016 |
| BL-2 | Nov 15, 2016 | Request | Issue Date: 11/15/2016; Service: Summons Issued; Method: Service Issued; Cost Per: $; BAYER HEALTHCARE PHARMACEUTICALS, INC.; 100 Bayer Road; PITTSBURGH, PA 15205; Tracking No: 5000181437; |

**Bloomberg Law®**

© 2017 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

AKMAN, JENNIFER, et al. vs. BAYER HEALTHCARE PHARMACEUTICALS, INC., et al., Docket No. 2016-CA-008298 (D.C.

| | | | |
|---|---|---|---|
| | | | BAYER HEALTHCARE PHARMACEUTICALS, INC.; 100 Bayer Blvd; WHIPPANY, NJ 07981; Tracking No: 5000181438; BAYER CORPORATION; 100 Bayer Road; PITTSBURGH, PA 15205; Tracking No: 5000181439; COBALT LABORATORIES, INC.; 24840 S Tamiami Trl, Ste 1; BONITA SPRINGS, FL 34134; Tracking No: 5000181440; ACTAVIS PHARMA COMPANY; 6733 Mississanga Road; Suite 400; Mississauga, ON,.,,; Tracking No: 5000181441 |
| BL-3 | Dec 30, 2016 | Request | Affidavit of Service of Summons & Complaint on; BAYER HEALTHCARE PHARMACEUTICALS, INC. (Defendant) |
| BL-4 | Dec 30, 2016 | Request | Proof of Service; Method : Service Issued; Issued : 11/15/2016; Service : Summons Issued; Served : 12/27/2016; Return : 12/30/2016; On : BAYER HEALTHCARE PHARMACEUTICALS, INC.; Signed By : Brad Fiorendo, Esq.; Reason : Proof of Service; Comment :; Tracking #: 5000181438 |
| BL-5 | Dec 30, 2016 | Request | Affidavit of Service of Summons & Complaint on; BAYER CORPORATION (Defendant) |
| BL-6 | Dec 30, 2016 | Request | Proof of Service; Method : Service Issued; Issued : 11/15/2016; Service : Summons Issued; Served : 12/24/2016; Return : 12/30/2016; On : BAYER CORPORATION; Signed By : Kayla Dingman; Reason : Proof of Service; Comment :; Tracking #: 5000181439 |

This does not constitute the official record of the court. The information is provided "as is" and may be subject to errors or omissions.

**Bloomberg Law®**

© 2017 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

AKMAN, JENNIFER, et al. vs. BAYER HEALTHCARE PHARMACEUTICALS, INC., et al., Docket No. 2016-CA-008298 (D.C.

# General Information

| | |
|---|---|
| **Court** | Superior Court of District Columbia |
| **Docket Number** | 2016-CA-008298 |
| **Status** | Open |

Bloomberg Law®

© 2017 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service